# Kimberlee Bradley v. H.A. Manosh Corporation

[601 A.2d 978]

No. 89-202

Present: **Gibson, Dooley and Johnson, JJ., and Peck, J. (Ret.) and Springer, D.J. (Ret.), Specially Assigned**

Opinion Filed November 1, 1991

*Robert D. Rachlin* and *Margaret H. O'Donnell* of *Downs Rachlin & Martin* and *Norman R. Blais* of *Blais, Cain, Keller & Fowler*, Burlington, for Plaintiff-Appellee.

*Michael B. Clapp* of *Dinse, Erdmann & Clapp*, Burlington, for Defendant-Appellant.

**Gibson, J.** Plaintiff Kimberlee Bradley brought this suit against defendant H.A. Manosh Corporation, a construction company, for injuries incurred at defendant's maintenance garage when an automobile defendant's employee was repairing lurched forward, crushing her leg against another vehicle. The jury found plaintiff had suffered damages totaling $245,000, but awarded only $122,745 after finding plaintiff had been 49.9% negligent herself.

Defendant appeals from the trial court's denial of its motions for directed verdict, for judgment notwithstanding the verdict and for reduction of damages by the amount of uninsured motorist payments received by plaintiff. Plaintiff appeals the court's denial of her motion for additur or a new trial on damages. We affirm the jury's award.

## I.

On a Sunday morning in August 1983, plaintiff visited the garage owned by defendant. Randy Manosh was working on his Chevrolet Vega, although the garage was not open for business that day. Defendant allowed its employees to use its facilities in off-hours to work on their automobiles or otherwise use the equipment in the garage for their own purposes. Defendant was aware that Randy had used the garage at such times in the past. Howard Manosh, president, chief executive officer and sole shareholder of defendant corporation, testified that he had the authority to control the employees, including Randy, during off-hours when they were using the garage. Employees did not have to seek permission to use the garage, and the corporation had no objection to employees bringing nonemployees into the garage during off-hours. Howard Manosh also testified that employees were representatives of the company while using the garage, and had the authority to grant or deny others access to the garage.

Plaintiff sat on a roller board in front of Randy's car as he worked. At one point, Randy told plaintiff that he was about to start the car. She asked whether it would move, and Randy told her that it could not move because the transmission fluid had been drained. He then started the car by wiring it from outside the vehicle. He had forgotten, however, to engage the emergency brake and disengage the transmission, and the car

jumped forward, crushing plaintiff's leg against another vehicle. As a result, plaintiff's lower leg and knee had to be amputated. Defendant has conceded that Randy's actions were negligent and led to plaintiff's injuries.

There was evidence that Randy was a safe and prudent mechanic. There was also evidence that Randy had been convicted of careless and negligent driving in 1978, and of driving while under the influence in April of 1983. At the time of the accident, Howard Manosh was aware of these convictions.

The case was tried on the theories of unsafe premises and negligent supervision and control. At the close of plaintiff's evidence, the court directed a verdict for defendant on the issue of unsafe premises. Plaintiff does not appeal that ruling. The issues on appeal concern the sufficiency of the evidence and the damage award.

## II.

We find that the evidence was sufficient to establish a duty on the part of defendant to supervise and control its employee, Randy Manosh. It is well established that generally "there is no duty to control the conduct of another in order to protect a third person from harm." *Poplaski v. Lamphere,* 152 Vt. 251, 256, 565 A.2d 1326, 1329 (1989). We have recognized certain exceptions to this general rule, however, "'where there is . . . a special relationship between two persons which gives the one a definite control over the actions of the other.'" *Peck v. Counseling Service of Addison County, Inc.,* 146 Vt. 61, 65, 499 A.2d 422, 425 (1985) (quoting Harper & Kime, *The Duty to Control the Conduct of Another,* 43 Yale L.J. 886, 895 (1934)). In *Poplaski,* we noted that such a special relationship might arise when "an off-duty employee's negligent acts occurred on the master's premises or while using his chattels." 152 Vt. at 257, 565 A.2d at 1330. The evidence in this case established that such a relationship did exist between defendant and Randy Manosh.

This special relationship is defined in § 317 of the Restatement (Second) of Torts (1965):

> A master is under a duty to exercise reasonable care so to control his servant while acting outside the scope of his employment as to prevent him from intentionally harming

others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if

    (a) the servant

        (i) is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, or

        (ii) is using a chattel of the master, and

    (b) the master

        (i) knows or has reason to know that he has the ability to control his servant, and

        (ii) knows or should know of the necessity and opportunity for exercising such control.

Where there is such a special relationship, we are satisfied that the risk of liability should fall upon the employer if its failure to act was unreasonable. Bearing this responsibility is inherent in defendant's business enterprise. See *Carroll v. Station Managers, Inc.*, 104 Misc. 2d 1014, 1016, 429 N.Y.S.2d 825, 827 (Civ. Ct. 1980). If the actor is a servant upon his master's premises, a duty to act reasonably to control that servant's actions arises if the master has knowledge of (1) ability to control, (2) need to control, and (3) opportunity to control that servant.

█ In this case, Randy Manosh was employed by defendant at the time of plaintiff's injury. As such, he was a servant upon his master's premises. Defendant argues that on the Sunday morning when Randy was in the garage, he was not a "servant" because he was there during off-hours, and not as an employee acting within the scope of his employment. The fact that Randy was not acting within the scope of his employment is irrelevant, however, to an analysis of a master's liability for an off-duty employee's negligence. Defendant granted its employees the privilege of using the maintenance garage in off-hours, and allowed them use of the garage as a "privilege and benefit." In other words, use of the garage was an informal part of the employment arrangement, and Howard Manosh clearly considered himself to have authority over his employees' activities in the garage. It is precisely this situation that § 317 of the Restatement contemplates:

    [The employer] is required to police his own premises . . . to prevent his servant from doing harm to others . . . . This

> is true although the acts of the servant while upon the premises . . . are done wholly for the servant's own purposes and are, therefore, outside the course of the servant's employment and thus do not subject the master to liability under the rules of the law of Agency.

Restatement (Second) of Torts § 317 comment b. Thus, for purposes of this analysis, Randy Manosh was a servant on his master's premises that Sunday morning.

The evidence also established that defendant knew it had the ability and the opportunity to control its off-duty employees in the garage. Howard Manosh so testified, and he had at least once earlier exercised that control by asking Randy to remove his car from the garage, which Randy did.

█ The more difficult question comes with the test of whether the employer knew of the need to exercise control. As proof of this knowledge, plaintiff submitted evidence that defendant was aware of Randy Manosh's convictions of careless and negligent driving and driving while under the influence. Defendant complains that this evidence was not probative of defendant's need to control Randy. We conclude, however, that the evidence was relevant and sufficient to allow the jury to find that Randy Manosh was predisposed to careless behavior when dealing with automobiles. Plaintiff was not limited to evidence of prior negligence in repairing automobiles to prove that Randy posed a danger. A reasonable person may fairly conclude that a person convicted of driving while intoxicated and of careless and negligent driving is not sufficiently alert to the need for care around automobiles. Cf. *McCarson v. Foreman*, 102 N.M. 151, 156, 692 P.2d 537, 542 (Ct. App. 1984) (conviction for possession of cocaine held relevant to issue of negligent entrustment of automobile, even though no conviction for driving while under the influence of drugs).

█ It was not the convictions alone, however, that gave rise to the need to control in this case. Defendant's garage housed water-well equipment, plumbing trucks, hoists, welding equipment, and plumbing and painting equipment. Defendant allowed its employees to use the garage and equipment during off-hours without asking permission. Defendant estimated that over half of its fifty employees had keys to the garage. It al-

lowed friends and family members to accompany employees into the garage, but had no system for supervising use of the garage during off-hours. In view of all the facts, it is reasonable to conclude that defendant knew or should have known of the need to control Randy's actions. Because defendant exercised no control over Randy that Sunday morning, the jury could reasonably have found that defendant had breached its duty to exercise reasonable control. The court properly denied defendant's motions for directed verdict and for judgment notwithstanding the verdict.

## III.

The remaining issues concern the damage award. Defendant contends that the trial court should have reduced the award by the amount plaintiff had received from her father's uninsured motorist (UM) insurance carrier. Plaintiff argues that the jury award was inadequate, and that the trial court should have granted a new trial on the damage issue. We find both arguments without merit.

At the time of the accident, plaintiff was covered by her father's UM policy. Randy Manosh was an uninsured motorist. In a pretrial settlement agreement, the UM carrier agreed to pay plaintiff $200,000, provided it would receive reimbursement up to $200,000 out of any recovery from defendant, whom it agreed to sue jointly with plaintiff. If the recovery were less than $250,000, plaintiff was to receive the difference between $250,000 and the amount of the recovery, not to exceed $50,000. Thus, plaintiff would receive $50,000 out of the award herein, and the UM carrier would receive the balance, $72,745.

Defendant argues that its liability should be eliminated by subtracting from the jury award the amount plaintiff was paid by the UM carrier, under the theory that the UM payment was the equivalent of a settlement with a joint tortfeasor. See *Slayton v. Ford Motor Co.*, 140 Vt. 27, 29, 435 A.2d 946, 947 (1981) ("[A] damage award against one tortfeasor must be reduced by the amount of a settlement between the plaintiff and another tortfeasor."). We disagree.

UM coverage is required by statute "for the protection of persons insured thereunder who are *legally entitled* to recover damages, from owners or operators of uninsured . . . motor

vehicles." 23 V.S.A. § 941(a) (emphasis added). In other words, UM insurance payments compensate accident victims for damages caused by uninsured motorists who are found or are conceded to have been negligent. In a case where an accident victim looks to her carrier for UM coverage, the carrier stands "'jointly liable with the uninsured motorist, or in his stead, to the extent specified in the statute.'" *Muir v. Hartford Accident & Indem. Co.*, 147 Vt. 590, 594, 522 A.2d 236, 238 (1987) (quoting *Rhault v. Tsagarakos*, 361 F. Supp. 202, 206 (D. Vt. 1973)). From this, it might seem that a tortfeasor, such as defendant, ought to be allowed to subtract from a damage award any settlement the plaintiff receives from an insurer standing jointly liable with an uninsured motorist.[1] Such a result cannot be justified, however.

■   First, the purpose of the statute requiring UM coverage is "to benefit an insured who has provided protection for others, to obtain protection himself." *Rhault*, 361 F. Supp. at 206. "Neither the statute nor the policy is designed for the benefit of the uninsured motorist. . . . [The coverage] is in the nature of a limited type of accident insurance rather than the usual indemnity contract." *Id.* at 207. Although the liability of the UM carrier is measured, to the limits of the policy, by the negligence of the uninsured motorist, the carrier is not otherwise linked to the motorist. The carrier stands "jointly liable" with the uninsured motorist, *Muir*, 147 Vt. at 594, 522 A.2d at 238, and is obligated to pay damages for which the uninsured motorist is found liable, but the carrier has no authority to represent or control the uninsured motorist during the course of any litigation. See *Rhault*, 361 F. Supp. at 206.

■   Thus, the UM carrier has a status different from that of insurance carriers who represent other tortfeasors. Their con-

---

[1] Defendant relies on a California decision, *Waite v. Godfrey*, 106 Cal. App. 3d 760, 163 Cal. Rptr. 881 (1980), as authority for such an outcome. *Waite* involved a chain reaction accident where the driver of the first car to cause impact left the scene. Based on the conceded negligence of the absent driver, the court allowed the two defendant drivers to deduct from the damage award the plaintiff's recovery from her UM carrier. *Waite* has not been followed, and we find it unpersuasive, primarily because UM carriers are entitled to be reimbursed when accident victims are fully compensated. See text, *infra*.

485

tractual obligation is to persons allegedly at fault, whereas the contractual obligation of the UM carrier is to the injured party. It would be inequitable to allow a tortfeasor to escape liability whenever a plaintiff receives timely payment from her UM carrier. "A person committing a tort cannot set up in mitigation of damages that somebody else, with whom he had no connection, has either in whole or in part indemnified the party injured." *Weber v. Morris & Essex R.R.*, 36 N.J.L. 213, 215 (1873), *quoted in Northeastern Nash Automobile Co. v. Bartlett*, 100 Vt. 246, 258, 136 A. 697, 701 (1927).

■■ Second, the obligation of a UM carrier is to provide UM coverage up to the limits of its policy, for the portion of the accident victim's total judgment that is unsatisfied by recovery from other sources. *Muir*, 147 Vt. at 594, 522 A.2d at 238–39. A UM carrier is therefore entitled to reimbursement for payments it makes to an accident victim to the extent the victim's total recovery from all sources exceeds his or her damages; the carrier is entitled to no reduction of UM coverage, however, where the victim is not fully compensated. Thus, tortfeasors jointly liable with an uninsured motorist may not reduce their liability by the amount of payments made under UM coverage because any potential windfall to the plaintiff will instead pass through to the UM carrier as reimbursement for payments already made.

Both the UM statute, 23 V.S.A. § 941(e), and most policies, including that of plaintiff's father herein, require that any recovery from a person legally responsible for an accident involving an uninsured motorist be passed on to the UM carrier to the extent of its payments.[2] These provisions have been construed strictly by Vermont courts in cases—unlike this one—where the plaintiffs have had to battle for payment from their UM car-

---

[2] 23 V.S.A. § 941(e) provides:

> If payment is made under uninsured motorist coverage, and subject to the terms of that coverage, to the extent of that payment, the insurer is entitled to the proceeds of any settlement or recovery from any person legally responsible for the damage or personal injury, as to which the payment was made . . . .

The UM policy covering plaintiff provides:

> If we make any payment and the insured recovers from another party, the insured shall hold the proceeds in trust for us and pay us back the amount we have paid.

riers. See, e.g., *Rhault*, 361 F. Supp. 202; *Muir*, 147 Vt. 590, 522 A.2d 236. In *Muir*, the UM carrier was not allowed to reduce its payment where the accident victim had not been compensated fully, 147 Vt. at 592, 522 A.2d at 238, and reimbursement was restricted under the provisions of § 941(e) to recoveries from uninsured motorists only. *Id.* at 594, 522 A.2d at 239.

The instant case, however, is unlike *Muir* in that the sum of the victim's UM payments and her jury award exceeds the monetary damages determined by the jury. Under these facts, the UM carrier's reimbursement from a tortfeasor other than the uninsured motorist is proper so that the victim is not overcompensated. If such reimbursement is allowed, the purpose of UM coverage—that victims be compensated as if uninsured drivers were insured—is achieved without allowing double recovery. See *Milbank Mutual Ins. Co. v. Kluver*, 302 Minn. 310, 313, 225 N.W.2d 230, 232 (1974) ("It would be absurd to permit [the victim] to recover double damages and it is just as absurd to permit [reimbursement] . . . where she has not been fully compensated.").

We realize that plaintiff will receive a small windfall in that she will recover $250,000 for damages the jury found to total $245,000 and for which the jury found her partly responsible.[3] This result, however, stems only from the terms of plaintiff's settlement agreement with her UM carrier. She is entitled to the benefit of this bargain, which has not been challenged. Further, UM carriers should be encouraged to pay claims promptly once the liability of an uninsured motorist has been established; accident victims should not have to wait to be compensated until the fault of all parties has been determined whenever an uninsured motorist is involved.

Finally, we reject plaintiff's claim that the jury award was inadequate. "[F]irst the jury, and then the court in ruling on the motion to set aside, have the liberty of broad discretionary judgment" in determining the adequacy of the damage award. *Kerr v. Rollins*, 128 Vt. 507, 510, 266 A.2d 804, 806

---

[3] The jury measured plaintiff's negligence against that of defendant only. The jury was not asked to measure plaintiff's negligence against that of Randy Manosh.

(1970). The parties stipulated to medical and hospital expenses of $26,501.25. The remainder of the $245,000 total damages found by the jury was compensation for pain and suffering. We are not persuaded that the trial court abused its discretion in denying plaintiff's motions for additur and new trial.

*Affirmed.*