955 P.2d 1069

**AIG HAWAII INSURANCE COMPANY, INC., Plaintiff–Appellant,**

v.

**Ruth RUTLEDGE and Jonathan Rutledge, Defendants–Appellees.**

**No. 20036.**

Intermediate Court of Appeals of Hawai'i.

March 31, 1998.

Carleton B. Reid and Kathy M. Sarria, Reid, Richards & Miyagi, on the briefs; Honolulu, for plaintiff-appellant.

Paul A. L'Ecuyer, on the brief, for defendants-appellees.

Before BURNS, C.J., and WATANABE and ACOBA, JJ.

ACOBA, Judge.

█ We hold that when an insured motorist, who has received uninsured motorist (UM) benefits from his or her insurer as a result of a motor vehicle accident with an uninsured motorist, obtains a tort recovery from the uninsured motorist or a party jointly liable which fully compensates the insured for damages sustained in the accident, the insurer may enforce a policy provision requiring the insured motorist to reimburse the insurer for UM benefits paid. This will ensure that the fully-compensated insured does not receive duplicative compensation in contravention of the purpose of the UM statute. Accordingly, in light of their recovery of the damages caused by the uninsured driver from the joint tortfeasor, the City and County of Honolulu (the City), Defendants–Appellees Ruth Rutledge (Ruth) and Jonathan Rutledge (Jonathan) (collectively referred to herein as the Rutledges) must return the UM benefits paid to them by Plaintiff–Appellant AIG Hawaii Insurance Company, Inc. (AIG). Under these circumstances, we endorse the principle of full but not duplicative recovery for insureds receiving UM benefits. Therefore, we vacate the July 11, 1996 summary judgment of the first circuit court (the court) to the contrary and conclude that AIG is entitled to reimbursement for the UM benefits paid to the Rutledges.

I.

A.

On August 3, 1991, an unidentified driver in a white pick-up truck swerved in front of Ruth, causing her to turn her vehicle out of its path and into a boulder. Ruth and Jonathan, her passenger, sustained injuries for which medical treatment costs were in excess of the statutory "no-fault tort threshold."[1]

AIG paid UM benefits to Ruth in the amount of $35,000 and to Jonathan in the amount of $35,000, in accordance with AIG's automobile insurance policy (policy). The policy provided that AIG must be reimbursed for its payments from any recovery the Rutledges obtained "from another":

> (2) Injury occurs to such person in a motor vehicle accident in which the amount paid or accrued exceeds the medical-rehabilitative limit established in [HRS § ] 431:10C–308 for expenses provided in [HRS § ] 431:10C–103(10)(A) and (B) [ (defining and limiting no-fault benefits) ]; provided that the expenses paid shall be presumed to be reasonable and necessary in establishing the medical-rehabilitative limit[.]

HRS § 431:10C–306(b)(2).

---

1. Hawai'i Revised Statutes (HRS) § 431:10C–306 (1993), in effect at the time of the accident, abolished tort liability with certain exceptions. One exception retained tort liability where a person in a motor vehicle accident sustained injuries which required medical treatment costing in excess of an established "medical-rehabilitative limit":

> (b) Tort liability is not abolished as to the following persons ... in the following circumstances:

A. If [AIG] make[s] a payment under this policy and the person to or for whom payment was made has a right to recover damages from another we shall be subrogated to that right. That person shall do whatever is necessary . to enable us to exercise our rights and shall do nothing after loss to prejudice them.

B. *If [AIG] make[s] a payment under this policy and the person to or for whom payment is made recovers damages from another, that person shall hold in trust for us the proceeds of the recovery and shall reimburse us to the extent of our payment.*

(Emphasis added.) [2]

Subsequently, on August 5, 1992, each of the Rutledges signed a separate Release and Trust Agreement (the release) provided by AIG. The release stated, in relevant part, that AIG was entitled to repayment of the "proceeds of any settlement or judgment ... against the owner or operator of the uninsured automobile involved":

I, ... in consideration of [$35,000] ... paid by ... [AIG] ... do hereby for myself ... forever discharge the said [AIG] from ... any and all claims for damages instituted against the said [AIG] *under the Uninsured Automobile Coverage* ... by me, or by any other person ... for the purpose of enforcing a claim for damages on account of injuries suffered by me as the result of

[the] accident involving [the] Uninsured Vehicle....

I agree that *[AIG] shall be entitled to the extent of such payment hereunder to the proceeds of any settlement or judgment that may result from the exercise of any rights of recovery by me against the owner or operator of the uninsured automobile involved in the accident causing the injury on account of which such payment is made.*

I also agree ... to take through an Attorney designated by ... [AIG] and at [its] sole expense ... such action or actions as may be necessary or appropriate to recover from the owner, operator, persons or organizations responsible for the operation of the uninsured automobile causing the injury and damage ... and furthermore, agree to hold any monies received as a result of settlement or judgment in Trust for [AIG] ... provided, however, that any sum received in excess of the amount paid by [AIG] shall be retained by me.

(Emphases added.)

On May 17, 1993, the Rutledges filed suit against the City and against "third[-]party defendants," alleging negligent design of the roadway and negligent maintenance of the roadway shoulder.[3] The case was subsequently accepted into the Court Annexed Arbitration Program.[4]

2. A copy of the policy was attached as Exhibit A to Plaintiff–Appellant AIG Hawaii Insurance Company, Inc.'s (AIG) memorandum in opposition to the motion for summary judgment filed by Defendants–Appellees Ruth Rutledge (Ruth) and Jonathan Rutledge (Jonathan) (collectively the Rutledges), and was properly sworn to under Hawai'i Rules of Civil Procedure Rule 56(e). The affidavit of Jeffrey Ross (Ross), an assistant manager at AIG, indicated that he had personal knowledge of when the policy was issued to Ruth and that the copy attached was a true and correct copy of the policy sent to Ruth. *See Fuller v. Pacific Medical Collections, Inc.*, 78 Hawai'i 213, 891 P.2d 300 (App.1995) (holding that mere statements in affidavits referring to exhibits do not authenticate exhibits referred to unless affidavit indicates affiant was qualified to swear to or certify exhibits).

3. The May 17, 1993 complaint filed by the Rutledges is not in the record. Thus, it is not clear

whether the Rutledges named defendants in addition to the City and County of Honolulu (the City), or whether any other claims were brought, in the Rutledges' suit. We also cannot discern whether the City filed a third-party complaint against the unidentified driver as a John or Jane Doe defendant.

4. The Court Annexed Arbitration Program is a "mandatory and nonbinding arbitration program [which] provide[s] ... a procedure to obtain prompt and equitable resolution of certain civil actions in tort through arbitration." HRS § 601–20(a) (1993). The Hawai'i Administrative Rules (HAR) were adopted by the Hawai'i Supreme Court for "the implementation and administration of the program," pursuant to HRS § 601–20(a). *See Darcy v. Lolohea*, 77 Hawai'i 422, 424, 886 P.2d 759, 761 (App.), *cert. denied*, 77 Hawai'i 489, 889 P.2d 66 (1994).

On June 22, 1994, a nonbinding arbitration award was rendered.[5] The award reflects that the arbitrator apportioned the negligence for the accident as follows: "10% [to Ruth], 0% [to Jonathan], 30% [to the City] and 60% to the phantom driver."[6] Ruth's damages were determined to be $70,000 in general damages and $44,483.61 in special damages; taking into account her 10% comparative negligence, Ruth was awarded $63,000 in general damages and $40,035.24 in special damages. Jonathan's damages were determined to be $25,000 in general damages and $24,195.80 in special damages; Jonathan was awarded the full amounts.

Because no party filed a written "Notice of Appeal [from the arbitration award] and Request for Trial De Novo," the award became a final judgment twenty days later, pursuant to Hawai'i Arbitration Rules (HAR) Rule 21. *See infra* part IV.A.1. The City paid the judgment amount in full.

## B.

On October 24, 1994, AIG filed a complaint for breach of contract against the Rutledges. The complaint sought recovery of "the total of the [UM] benefits paid and/or received by [the Rutledges]" and an award of attorneys' fees and costs associated with the case. AIG alleged that the policy issued to Ruth required the Rutledges to reimburse AIG.

On June 23, 1995, the Rutledges filed their motion for summary judgment, claiming that (1) reimbursement was barred under the terms of the release they signed as a condition of receiving the UM benefits from AIG, and (2) AIG had waived its right to reimbursement because it did not participate in the suit against the City.

AIG opposed the motion, arguing that (1) the policy terms directed "that if [AIG] makes a payment under the policy and the person receiving payment has a right to re-

cover damages 'from another,' AIG is subrogated to that right," and (2) as represented in AIG's assistant manager's affidavit, AIG was unaware of the Rutledges' suit against the City until more than a month after the arbitration award was filed. AIG further maintained that the policy required the amount recovered "be held in trust" and "be used to reimburse [AIG]."

On August 4, 1995, the court heard the motion and took it under advisement.[7] The court also instructed each party to submit additional memoranda addressing the issue of "whether or not the payment of the judgment by [the City] can be credited to the uninsured phantom vehicle."

On September 14, 1995, the court issued a minute order granting the Rutledges' motion. The minute order stated:

> AIG's Release and Trust Agreement is unambiguous. AIG's rights to recover payments it made under its uninsured motorist coverage is monies obtained by the insured "against the owner or operator of the uninsured automobile involved in the accident causing the injury on account of which such payment is made."
>
> Furthermore, *Caberto v. National Union Fire Ins. Co.*, 77 Hawai'i 39[, 881 P.2d 526] (1994), is instructive in this case. The [Hawai'i] Supreme Court has strictly construed the insurer's right to subrogation. In the instant case, by its payment of uninsured motorist coverage, *AIG is subrogated to the [Rutledges'] rights to recover against the uninsured motorist. [The Rutledges'] judgment and recovery was against [the City,] not the uninsured motorist.* Counsel notified of court's decision. [Defense counsel] to prepare the order.

(Emphasis added.)

On October 27, 1995, the written order granting the Rutledges' motion for summary judgment was filed.

---

5. The record does not contain a copy of the actual arbitration award. However, attached to AIG's memorandum in opposition to the Rutledges' motion for summary judgment as Exhibit D, is a copy of a page from the publication, "Personal Injury Judgments Hawaii," which summarizes the arbitration award. The authenticity of this document is not disputed, and the Rutledges admitted the material terms of the award in their answer to AIG's complaint.

6. The term "phantom driver" as used by the arbitrator apparently referred to the uninsured motorist involved in the subject accident.

7. AIG's brief refers to the August 4, 1995 hearing transcript, but the transcript was not made a part of the record on appeal.

On November 28, 1995, the Rutledges moved for attorneys' fees pursuant to Hawai'i Rules of Civil Procedure Rule 11 and Hawai'i Revised Statues (HRS) § 607–14.5 (1993) [8] asserting that AIG had no reasonable basis for filing the action.

On February 6, 1996, the court entered its written order denying the Rutledges' request for attorneys' fees.

On July 11, 1996, final judgment granting the Rutledges' motion for summary judgment but denying their motion for attorneys' fees and costs was filed.

On August 6, 1996, AIG appealed.

## II.

AIG maintains that under the policy terms, the release does not limit AIG's right to reimbursement from the Rutledges' recovery of damages "from another." The precise issues presented by AIG are (1) whether AIG is entitled to be reimbursed under the terms of the policy; (2) whether the releases signed by the Rutledges waived or released AIG's rights; (3) whether AIG is estopped from relying on language in the policy; and (4) whether the Rutledges' double recovery violates the policy behind the no-fault law.

In response, the Rutledges [9] argue that the release bars any claim for reimbursement, because they recovered damages from the City, not from "the owner or operator of the uninsured automobile involved in the accident." Also, the Rutledges reiterate their defense that AIG "waived its right to reimbursement of any UM benefits" because "it did not participate in the underlying lawsuit" against the City.[10]

## III.

Irrespective of whether the policy provision or the release provision controls,[11] we must determine whether permitting reimbursement of UM benefits here would be in

**8.** HRS § 607–14.5 (1993) provides:

**Attorneys' fees in civil actions.** (a) In any civil action in this State where a party seeks money damages or injunctive relief, or both, against another party, and the case is subsequently decided, the court may, as it deems just, assess against either party, and enter as part of its order, for which execution may issue, a reasonable sum for attorneys' fees, in an amount to be determined by the court upon a specific finding that the party's claim or defense was frivolous.

(b) In determining the award of attorneys' fees and the amounts to be awarded, the court must find in writing that all claims or defenses made by the party are frivolous and are not reasonably supported by the facts and the law in the civil action.

**9.** Paul A. L'Ecuyer (L'Ecuyer) represented the Rutledges before the first circuit court in AIG's suit against them. Although L'Ecuyer filed an answering brief for the Rutledges on appeal, he stated that he no longer represented the Rutledges and did not know of their whereabouts; he asserted that he filed the brief "merely to provide th[is] court with some background from the perspective of the [Rutledges]." We note that we must decide the merits of this appeal nonetheless because AIG appealed and has submitted briefs in this matter.

**10.** Ross's affidavit stated that the first notice he received of the Rutledges' suit against the City was on or about July 26, 1994, when he reviewed a summary of the arbitration award published in "Personal Injury Judgments in Hawaii." To dis-

pute this, the Rutledges merely state in their summary judgment memorandum and on appeal that "AIG had notice of potential claims against [the City] during the disputes arising out of UM coverage and AIG's failure to intervene in the suit against [the City] and assert any rights clearly prejudiced [the Rutledges]." The Rutledges did not file any opposing affidavit and do not appear to argue at any point that they in fact gave notice to AIG of their suit against the City. We observe that, under the policy, the Rutledges agreed to "do whatever [wa]s necessary to enable [AIG] to exercise [its] rights" after AIG made a payment under the policy. Also, under the release, the Rutledges agreed "to take through an Attorney designated by . . . [AIG] and at [its] sole expense . . . such action or actions as may be necessary or appropriate to recover from the owner, operator, persons or organizations responsible for the operation of the uninsured automobile causing injury and damage[.]"

"Waiver is generally defined as an intentional relinquishment of a known right, a voluntary relinquishment of some rights, and the relinquishment or refusal to use a right." *Association of Owners of Kukui Plaza v. Swinerton & Walberg Co.*, 68 Haw. 98, 108, 705 P.2d 28, 35 (1985) (internal quotation marks and citations omitted). On these facts, we cannot conclude that AIG waived its right to reimbursement by its nonparticipation in a suit which AIG claims not to have known about, when the Rutledges have not put forth evidence to dispute such claim.

**11.** Based on our disposition, *see infra*, we need not decide this issue.

conformity or conflict with Hawai'i's UM statute.[12] *See Dawes v. First Ins. Co. of Hawaii,* 77 Hawai'i 117, 121, 883 P.2d 38, 42, *reconsideration denied,* 77 Hawai'i 489, 889 P.2d 66 (1994) ("[L]iability insurers have the same rights as individuals to limit their liability, and to impose whatever conditions they please on their obligation, provided they are not in contravention of statutory inhibitions [sic] or public policy.") (internal quotation marks and citations omitted). At the time AIG issued its policy on or about February 20, 1991, UM coverage was governed by HRS § 431:10C–301(b)(3) (Supp.1991), which provided, in relevant part:

> (b) A motor vehicle insurance policy shall include:
>
> . . . .
>
> (3) With respect to any motor vehicle registered or principally garaged in this State, liability coverage provided therein or supplemental thereto, in limits for bodily injury or death set forth in [HRS § ] 287–7, under provisions filed with and approved by the commissioner, *for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles* because of bodily injury, sickness, or disease, including death, resulting therefrom; provided, however, that the coverage required under this paragraph shall not be applicable where any named insured in the policy shall reject the coverage in writing[.]

(Emphasis added.)

The purpose of the UM statute is demonstrated by the following legislative remarks:

The purpose of th[e] bill is to promote protection, through voluntary insurance, for persons who are injured by uninsured motorists who cannot pay for personal injuries caused by motor vehicle accidents. The bill would require all companies writing policies insuring against liability for personal injuries and property damages to offer to their clients "uninsured motorist protection."

An insurance company offering uninsured motorist protection engages to pay to the insured . . . sums not to exceed the stated limits, *for any uncollectible valid claims or unsatisfied judgment for damages resulting from bodily injury or death,* resulting from the . . . use of an automobile. *The claim becomes payable when the innocent victim shows* that his [or her] claim is valid, that is, that there is legal liability on the person alleged to be responsible and *that the claim cannot be collected* because of the financial irresponsibility of that person or *because of the inability to identify the person or persons responsible.*

Hse. Stand. Comm. Rep. No. 194, in 1965 House Journal, at 582 (emphases added); *see also DeMello v. First Ins. Co.,* 55 Haw. 519, 523 n. 4, 523 P.2d 304, 307 n. 4 (1974); *Dawes,* 77 Hawai'i at 123 n. 6, 883 P.2d at 44 n. 6; *Caberto,* 77 Hawai'i at 45, 881 P.2d at 532 (reiterating that the legislative intent of UM benefits was to provide protection " 'for persons who are injured by motorists whose liability policies are inadequate to pay for personal injuries' ") (quoting Hse. Conf.

---

**12.** We note that apparently no statute governed the reimbursement of uninsured motorist (UM) benefits. The legislature specifically provided for reimbursement of a portion of duplicate *no-fault* benefits in HRS § 431:10C–307 (Supp.1991), which provided:

> **Reimbursement of duplicate benefits.** Whenever any person effects a tort liability recovery for accidental harm, whether by suit or settlement, which duplicates no-fault benefits already paid under the provisions of this article, the no-fault insurer shall be reimbursed fifty per cent of the no-fault benefits by such person receiving the duplicate benefits, up to the maximum limit specified by [HRS § ] 431:10C–103(6) [ (1987 Special Pamphlet) ].

We do not believe HRS § 431:10C–307 controls AIG's right to reimbursement, however, because the "maximum limit" referred to in that section, as specified in HRS § 431:10C–103(6), was $15,000, which HRS § 431:10C–103(10)(B)(i) (Supp.1991) indicated was the aggregate limit for "basic" no-fault benefits *without* optional additional coverage (such as UM benefits) taken into account. Thus, HRS § 431:10C–307 concerned an insurer's right to reimbursement of the basic no-fault benefits paid, not UM benefits; an insurer's right to reimbursement of UM benefits paid to its insured was apparently not covered by statute.

Comm. Rep. No. 126–88, in 1988 House Journal, at 826).

The rationale for providing UM benefits has been further explained by the supreme court:

> Their purpose is to provide a remedy where injury is caused by an uninsured motorist; or, as has been more frequently stated, to provide a remedy to the innocent victims of irresponsible motorists who may have no resources to satisfy the damages they cause.... *Ideally, the purpose is to place those insured in the same position they would have occupied had the tortfeasor carried liability insurance.*

*Dawes,* 77 Hawai'i at 123, 883 P.2d at 44 (emphases added) (footnote and citation omitted).

Because the UM statute is considered to be a remedial statute, it is "to be construed liberally in order to accomplish the purpose for which [it was] enacted." *Id.* (internal quotation marks and citation omitted). Our supreme court has often looked to the legislative history of the UM statute in examining the validity of various provisions attempting to limit the insurer's liability for UM benefits. Two interrelated public policies emerge from these cases.

### A.

The importance of the first of these policies, to provide UM benefits to effect the greatest possible recovery of the insured's damages, was emphasized in *Walton v. State Farm Mut. Auto. Ins. Co.,* 55 Haw. 326, 518 P.2d 1399 (1974). In that case, the supreme court examined an insurance provision that, "with respect to coverage for bodily injury sustained by an insured while occupying a motor vehicle not owned by that insured, ... provide[d] only 'excess' [UM] insurance over the other applicable [UM] insurance coverage of the occupant-insured." *Id.* at 327, 518 P.2d at 1400. This clause was characterized as an "other insurance" provision because the insured's own UM insurance "applie[d] only to the extent that its limits exceeded the limits of any *other* [UM] insurance proceeds available to the occupant-insured." *Id.* at 327, 329, 518 P.2d at 1400–01 (emphasis in original) (footnote omitted).

The insured in *Walton,* a passenger in a car involved in an accident with an uninsured motorist, collected $10,000 in UM benefits from the host driver's insurer. *Id.* at 326, 518 P.2d at 1399. The limit for UM coverage in both the insured's and the host driver's UM policies was $10,000. *Id.* at 326, 518 P.2d at 1399–1400. After obtaining a judgment against the uninsured motorist for $25,-000, which remained uncollected, the insured submitted a claim for $10,000 in UM benefits from his own insurer. *Id.* at 326–27, 518 P.2d at 1400. Denying this claim, the insurer argued that the other insurance provision excused the insurer from paying the claim because the limit of UM benefits provided under the insured's policy was the same as the limit of UM benefits under the host driver's policy, which sum of UM benefits had already been collected by the insured from the host driver's insurance company. *Id.* at 327, 518 P.2d at 1400.

In reviewing the legislative history of the UM statute,[13] the supreme court observed that " '[t]he purpose of [the UM statute] is to promote protection, through voluntary insurance, for persons who are injured by uninsured motorists *who cannot pay for personal injuries caused by motor vehicle accidents.*' " *Id.* at 331, 518 P.2d at 1402 (quoting Stand. Com. Rep. 194, 1965 House Journal, at 582). It then "construed [this protective purpose as] invalidat[ing] ... 'other insurance' provisions ... in cases such as this *where [the insured] has been damaged to the extent of $25,000, and yet has been compensated therefor only to the extent of $10,000.*" *Id.* (emphasis added). Holding the other insurance provision at issue invalid, the supreme court emphasized that *"[c]ompensation of the injured party* is the more important focus of inquiry." *Id.* at 322, 518 P.2d at 1403 (emphasis in original). Therefore, the supreme court permitted the insured to recover the maximum amount of UM benefits from both

---

13. The supreme court examined the legislative history of HRS § 431–448 (1976) (repealed), the predecessor of HRS § 431:10C–301(b)(3).

his own insurer and the host driver's insurer,[14] and thus recover $20,000 of his $25,000 in damages.

### B.

The second public policy we glean from prior UM cases is that, although the insured should be compensated as much as policy limits will allow, double recovery of damages through the collection of UM benefits is generally not permitted. In *Walton*, the supreme court observed that "there would be inequity only if the insured tried to 'pyramid' or 'stack' several policy provisions *to build up a sum beyond his [or her] damage*, and thus gain a windfall." *Id.* at 332, 518 P.2d at 1403 (emphasis added).

The supreme court later characterized its decision in *Walton* as allowing the insured to "recover under both policies *so long as the total amount recovered did not exceed the actual damages suffered.*" *Palisbo v. Hawaiian Ins. & Guar. Co.*, 57 Haw. 10, 16, 547 P.2d 1350, 1355 (1976) (emphasis added). In another UM benefits case, it stressed that "regardless of what we determine [the insurer's] maximum potential [UM] liability to be, [the insured] will be entitled to in fact recover *no more than an amount sufficient to compensate for actual damages suffered.*" *Allstate Ins. Co. v. Morgan*, 59 Haw. 44, 46 n. 4, 575 P.2d 477, 479 n. 4 (1978) (emphasis added).

Dual recovery of liability and UM benefits under one policy has been disallowed, in part because "the stated purpose of the [UM] statute was that it be consistent 'with the overall intent of the no-fault law to provide speedy and adequate protection to persons injured in motor vehicle accidents *at the least possible cost.*'" *Kang v. State Farm Mut. Auto. Ins. Co.*, 72 Haw. 251, 255, 815 P.2d 1020, 1022 (1991) (quoting Sen. Stand. Comm. Rep. No. 689, in 1985 Senate Journal, at 1181 (emphasis added)). The supreme court reasoned that allowing dual recovery

"would transform [UM] coverage into liability insurance. This result would cause insurance companies to charge substantially more for [UM] coverage in order to match the cost of that coverage with the presently more expensive liability coverage. This increase in cost would discourage consumers from purchasing [UM] coverage, an important protection presently available for minimal cost."

*Id.* at 257, 815 P.2d at 1023 (quoting *Millers Cas. Ins. Co. of Texas v. Briggs*, 100 Wash.2d 1, 665 P.2d 891, 895 (1983)). This court found the same reasoning persuasive in upholding an "owned vehicle" policy exclusion which effectively barred recovery under both the liability and the underinsured motorist (UIM) benefit provisions of a single policy. *National Union Fire Ins. Co. v. Reynolds*, 77 Hawai'i 490, 491, 496, 889 P.2d 67, 68, 73 (App.1995).

We recognize that double recovery of damages was permitted in *Caberto*, where the supreme court considered the propriety of certain deductions made by an insurer in tendering UIM benefits to its insured. There the supreme court allowed the insured to recover twice for the same injury, once from workers' compensation benefits and again from UIM benefits, when it held that the policy provision requiring a "reduction of optional additional coverage (UM or UIM coverage) based on the amount of workers' compensation benefits received by the insured" was "void [as] against legislative intent and public policy." *Caberto*, at 42, 881 P.2d at 529.

The UIM endorsement in the insured's policy provided, in relevant part:

> *Any coverage afforded under this endorsement shall apply over and above any amounts available to an "insured" because of the bodily injury:*
>
>     1.  From or on behalf of persons or organizations who may be legally re-

---

**14.** Although the legislature amended the UM statute to prohibit the "stacking" of UM coverages, unless the insured purchased a policy with a stacking provision, as of January 1, 1993, *see Allstate Ins. Co. v. Hirose*, 77 Hawai'i 362, 364 n. 3, 884 P.2d 1138, 1140 n. 3 (1994), we believe that the supreme court's reasoning in *Walton v. State Farm Mut. Auto. Ins. Co.*, 55 Haw. 326, 518 P.2d 1399 (1974), remains instructive for the issue in this case because the legislative purpose behind the UM statute has remained the same.

sponsible. This includes all sums paid under Part A [liability coverage].

2. *Under any of the following:*

   a. *workers' compensation law;*

   b. *disability benefits law or similar law; or*

   c. *no-fault coverage.*

*Any payment under this coverage will reduce any amount that person is entitled to recover under* Part A *or* Part B *[uninsured motorist coverage] of this policy.*

*Id.* at 41, 881 P.2d at 528 (boldfaced emphasis in original; underscored emphases added). An arbitrator had determined the total amount of the insured's general and special damages to be $138,361.72. *Id.* at 40–41, 881 P.2d at 527–28. In paying UIM benefits to the insured, the insurer deducted the following amounts from the total damages: (1) $54,152.48 in workers' compensation benefits paid by the employer's worker's compensation insurer; (2) $11,950 in no-fault benefits paid by the insurer;[15] and (3) $35,000 in liability insurance paid by the tortfeasor's insurance carrier. *Id.* at 41, 881 P.2d at 528.

The supreme court observed that the legislative intent in providing UIM and UM benefits, which was to furnish

"a means of protection, through voluntary insurance, for persons who are injured by motorists *whose liability policies are inadequate to pay for personal injuries*[,]" would not be furthered if [the insurer were] allowed to offset its obligation to pay UIM benefits by the amount of workers' compensation benefits received by its insured.

*Id.* at 45, 881 P.2d at 532 (quoting Hse. Conf. Comm. Rep. No. 126–88, in 1988 House Journal, at 826) (emphasis added). Citing a case that discussed the relationship between workers' compensation and UM benefits, the

supreme court reasoned that " '[i]n order to effectuate the intent of the [UM] statute, the injured party should be able to realize the proceeds of his [or her] [UM] policy free from any reductions which would not be available in a suit against an insured tortfeasor.' " *Id.* (quoting *Sweeney v. Hartford Accident & Indem. Co.*, 136 N.J.Super. 591, 347 A.2d 380, 382–83 (1975)) (emphasis deleted).

The insurer argued that allowing the insured to recover both UIM and workers' compensation benefits would result in a windfall to the insured, and that "such dual recovery should not be allowed." *Id.* Disagreeing with this contention, the supreme court noted that " 'the coverages [for UM and workers' compensation benefits] are *discrete and independent, and premiums were paid for both.*' " *Id.* at 46, 881 P.2d at 533 (emphasis added) (quoting *Continental Ins. Co. v. Fahey*, 106 N.M. 603, 747 P.2d 249, 252 (1987)). Additionally,

[a]llowing [the insurer] to offset its [UM] liability by the amount of workers' compensation benefits [the insured] received would (1) defeat the purpose of [the insured] having purchased the optional additional coverage in the first place, and (2) result in a windfall to [the insurer] merely because [the insured] happened to be in the course and scope of his employment when he was injured.

*Id.*

### C.

With respect to the issue of an insurer's reimbursement of UM benefits from the proceeds of its insured's tort recovery, commentators and courts have expressed support for the principle of full, yet not duplicative, recovery of damages.

---

**15.** In addition to the question of reimbursement of worker's compensation benefits discussed above, in *Caberto v. National Union Fire Ins. Co.*, 77 Hawai'i 39, 42, 881 P.2d 526, 529 (1994), the supreme court concluded that underinsured motorist (UIM) benefits were exempt from no-fault reimbursement under HRS § 431:10C–307, *see supra* note 12 and, thus, the provision in the insurance policy requiring a deduction from UIM benefits for no-fault benefits paid was void. The supreme court relied on *Sol v. AIG Hawaii Ins.*

*Co.*, 76 Hawai'i 304, 308, 875 P.2d 921, 925, *reconsideration denied*, 76 Hawai'i 353, 877 P.2d 890 (1994), where it held invalid the insurer's contractual provision directing reimbursement of no-fault benefits from UM benefit proceeds "because the legislature intended to prevent no-fault insurers from subrogating against the optional additional coverages[.]" Accordingly, in *Sol*, UM coverage was determined to be exempt from no-fault reimbursement.

Thus, one commentator has urged that if "*the total damages [suffered by the insured] exceed the sources of collection, certainly the rights of the insured to be fully compensated should not be impaired.*" 8D J.A. Appleman & J. Appleman, *Insurance Law and Practice* § 5131, at 196 (1981) (emphasis added). The same commentator accordingly has observed that "there are not major equitable differences dictating [whether double recovery] is ... just, except in [the] *situation [where the insured's total damages exceed the sources of collection].*" *Id.* (emphasis added).

In such situations,

[c]ourts in a substantial number of states have concluded that the terms of a subrogation or trust provision are not enforceable when the insured has not been fully indemnified; consequently, *an attempt by an insurance company to secure proceeds of a recovery from a third party—such as the uninsured motorist or a party who is jointly liable—is appropriately denied when the damages sustained by an insured have not been completely compensated.*

2 A. Widiss, *Uninsured and Underinsured Motorist Insurance* § 19.6, at 124 (2d ed.1992) (emphasis added).

Full but not double recovery has been allowed by other courts considering reimbursement of UM benefits from tort recovery proceeds. After observing that "the obligation of a UM carrier is to provide UM coverage up to the limits of the policy, for the portion of the accident victim's total judgment that is unsatisfied by recovery from other sources[,]" the Vermont Supreme Court held that "[a] UM carrier is therefore entitled to reimbursement for payments it makes to an accident victim to the extent the victim's total recovery from all sources exceeds his or her damages [but] the carrier is entitled to no reduction of UM coverage ... where the victim is not fully compensated." *Bradley v. H.A. Manosh Corp.*, 157 Vt. 477, 601 A.2d 978, 983–84 (1991). The Vermont court explained that, in that case,

the sum of the victim's UM payments and her jury award exceeds the monetary damages determined by the jury. *Under these facts, the UM carrier's reimbursement from a tortfeasor other than the uninsured motorist is proper so that the victim is not overcompensated.* If such reimbursement is allowed, the purpose of UM coverage— that victims be compensated as if uninsured drivers were insured—is achieved without allowing double recovery.

*Id.* at 984 (emphasis added).

Although the Vermont Supreme Court was construing a statute and a policy provision which mandated that "any recovery from a person legally responsible for an accident involving an uninsured motorist be passed on to the UM carrier to the extent of its payments[,]" *id.* 601 A.2d at 984, the Kentucky Supreme Court has also recognized a "twofold" purpose of the common-law doctrine of subrogation in UM cases: "the prevention of double recovery by the plaintiff and a prevention of a windfall to the tortfeasor by benefiting from the payment of the insurance carrier without ultimately bearing at least some of the cost." *Wine v. Globe Am. Cas. Co.*, 917 S.W.2d 558, 562 (Ky.1996). The Kentucky court also emphasized that, "[u]nder general principles of equity, in the absence of statutory law or valid contractual obligations to the contrary, an insured must be fully compensated for losses sustained (made whole) before the subrogation rights of an insurance carrier arises." *Id.*

■ As exemplified in the foregoing discussion, in the allocation of tort recovery proceeds and UM benefits, we agree with the principle of full but not duplicative recovery of damages by the injured insured and apply it in this case.

## IV.

Based on the record before us, it appears that the Rutledges were fully compensated for their damages by the City.[16]

16. The insured in *Caberto* did not challenge the deduction in his UIM benefits for liability insurance proceeds he received from the tortfeasor's insurer, and hence the supreme court did not address the correctness of this deduction from UIM benefits paid to the insured. *Caberto*, 77 Hawai'i at 41, 881 P.2d at 528. We note that this deduction from UIM benefits is analogous to

A.

1.

In the Rutledges' supplemental summary judgment motion, their counsel acknowledged what he characterized as "the normal policy and procedures of insurers to seek subrogation for UM benefits paid on behalf of its [sic] insureds after it has been determined that the insured has in fact recovered its *full amount* of losses resulting from a personal injury." (Emphasis in original.) The Rutledges declared, however, that they were "not conced[ing]" that the judgment in their suit against the City "constitut[ed] full recovery . . . of their injuries sustained in the underlying accident." They asserted that they had not named the phantom driver as a defendant in their suit against the City,[17] and that "the arbitrator's unilateral decision to add the phantom vehicle as a potential tortfeasor and assess his [or her] liability in the context of the arbitration was inappropriate given the fact that Hawai['] i recognizes that an empty chair Defendant may not be assessed liability."

█ Examining the HAR in effect at the time the arbitration award was rendered on June 22, 1994,[18] we point out that the Rutledges were not without recourse if they believed that the arbitrator acted "inappropriate[ly]" in allegedly adding the phantom driver as a joint tortfeasor and assigning liability to the phantom driver. Under HAR Rule 11(B), a party may bring a challenge "to the authority or the act of an arbitrator" before the arbitration administrator, whose ruling may be appealed to the arbitration judge. Also, after the arbitrator renders an

award, HAR Rule 22(A) allows "any party" to file a written notice of appeal and request for trial de novo. There is nothing in the record to indicate that the Rutledges resorted to either of these rules.[19] Absent such steps, HAR Rule 21 provides that final judgment on the previously nonbinding award will be entered as follows:

> If, after twenty (20) days after the award is served upon the parties, no party has filed a written Notice of Appeal and Request for Trial De Novo, the clerk of the court shall, upon notification by the Arbitration Administrator, enter the arbitration award as a final judgment of the court. Said award shall have the same force and effect as a final judgment of the court in the civil action, but may not be appealed.

Construing this provision, this court has held that "an arbitration award which has become a final judgment pursuant to HAR Rule 21 may not be vacated or modified by the circuit court, or appealed to an appellate court. . . ." *Darcy v. Lolohea*, 77 Hawai'i 422, 424, 886 P.2d 759, 761 (App.), *cert. denied*, 77 Hawai'i 489, 889 P.2d 66 (1994). Because no party, including the Rutledges, appealed the arbitration award here, it became a final judgment. The Rutledges did not challenge or appeal the arbitrator's measure of their damages or the apportionment of them based on the respective liabilities of Ruth, the City, and the phantom driver. Thus, the Rutledges could not on summary judgment attack the amount of their total damages as found by the arbitrator, or the inclusion of the phantom driver in the apportionment of lia-

---

AIG's request for reimbursement for the UM benefits it paid to the Rutledges. In *Caberto*, the insured's UIM benefits were reduced by the amount the insured received from the underinsured motorist's carrier for injury caused by the underinsured motorist. In this case, AIG has sought, through reimbursement, to ultimately reduce (to zero) the Rutledges' UM benefits by the amount the Rutledges received from a judgment obtained for injuries caused by the uninsured motorist and the City.

17. Because the complaint filed by the Rutledges against the City is not a part of the record in this case, we cannot discern whether or not the unidentified driver was named or could have been

named as a defendant in that action. *See supra* note 3 and accompanying text.

18. The HAR examined above are not substantially different than the ones in effect currently. HAR Rule 11(B) has not changed. HAR Rules 21 and 22(A) were amended to permit the 20-day period in which to file a written notice of appeal and request for trial de novo to be extended by stipulation of the parties to a period of up to 40 days.

19. We express no opinion on the merits of the Rutledges' allegations concerning the arbitrator's actions.

bility.[20]

**2.**

Taking the amount of damages established by the arbitrator as binding upon the Rutledges, we conclude that they were in fact fully compensated for injuries caused by the uninsured motorist, because the City, as "joint tortfeasor," paid the uninsured motorist's share of both Ruth's and Jonathan's damages.

As said before, the arbitrator found that Ruth's total damages amounted to $114,483.61. Ruth was responsible for 10%, the City for 30%, and the "phantom driver" for 60% of the total damages. The City paid Ruth her total damages reduced by her 10% share of the liability. The City thus paid Ruth $34,345.08 for its own share of the total damages and $68,690.16 for the phantom driver's share.

Because Jonathan was not found to be comparatively negligent, the amount of his total damages was unreduced and the City paid Jonathan his full arbitration award. Of this amount, $4,919.58 was attributable to Ruth's 10% negligence, $14,758.74 to the City's 30% negligence, and $29,517.48 to the phantom driver's 60% negligence.[21]

■ Hence, the arbitrator determined the amounts of total damages suffered by Ruth and Jonathan as a result of the accident and apportioned parts of the total amounts to the negligence of the phantom, "uninsured" motorist; the City paid Ruth and Jonathan the amounts attributable to the phantom driver's negligence. We discern no reason, on the facts of this case, why reimbursement should be disallowed on the basis that a joint tortfeasor paid the uninsured motorist's portion

of damages. *See Bradley*, 601 A.2d at 983–84 (holding that when "the sum of the victim's UM payments and her jury award exceeds the monetary damages determined by the jury ..., the UM carrier's reimbursement *from a tortfeasor other than the uninsured motorist* is proper so that the victim is not overcompensated") (emphasis added); 2 A. Widiss, *Uninsured and Underinsured Motorist Insurance* § 19.6, at 124 (2d ed. 1992) ("'[A]n attempt by an insurance company to secure proceeds of a recovery from a third party—such as the uninsured motorist *or a party who is jointly liable*—is appropriately denied when the damages sustained by an insured have not been completely compensated.") (emphasis added).[22]

Regardless of who paid the damages, the fact that they were paid means that the Rutledges were "provide[d] a remedy" for the damages caused by the phantom motorist, and thus the Rutledges were "place[d] ... in the same position they would have occupied had the [phantom driver been identified and] carried liability insurance...." *Dawes*, 77 Hawai'i at 123, 883 P.2d at 44. Consequently, the purpose of providing UM benefits to the Rutledges was otherwise satisfied by the City's payment of the judgment, and they did not require UM benefits to fully compensate them for damages caused by the phantom driver.

**B.**

Because the Rutledges were fully compensated for their damages, allowing them to retain the UM benefits would result in their receiving a double recovery to the extent of those benefits. Ordering reimbursement would not result in a "windfall" to AIG be-

---

**20.** We find unpersuasive the Rutledges' contention that they "relied on the [release] in not appealing the [arbitration] award." The Rutledges argued in their supplemental summary judgment memorandum that they "could have appealed the arbitration award if they were aware that the [Agreement] language that they signed would be construed" so as to allow AIG to be reimbursed from the judgment paid to the Rutledges by the City. The fact remains that the Rutledges did not appeal the award, for whatever the reason, and thus the award and its apportionment of their total damages to the phantom driver became binding upon them.

**21.** Because the arbitrator found Ruth's negligence to be 10%, it appears that Ruth should have been responsible for 10% of the award to Jonathan, but the City paid the full amount of Jonathan's damages. We cannot discover a reason for this from the record.

**22.** Thus, under either the policy provision or the release provision concerning reimbursement, the Rutledges in effect recovered a judgment against the owner or operator of the uninsured automobile and damages caused by such uninsured motorist.

cause UM benefits were to be paid only if "the [tort] claim [could] not be collected." *Id.* at 123 n. 6, 883 P.2d at 44 n. 6. When the City, as joint tortfeasor, paid the phantom driver's portion of the judgment, the Rutledges in effect "collected" their claims against the uninsured motorist. Had the Rutledges recovered their damages attributable to the phantom driver prior to requesting UM benefits, AIG would not have paid out benefits to them.

The Rutledges' receipt of judgment proceeds from the City is not analogous to the insured's recovery of workers' compensation benefits in *Caberto,* in the sense that the "coverage" provided by the City and the coverage provided by the UM benefits were not "discrete and independent." The damages paid by the City and the UM benefit payments covered the same injuries to the Rutledges and were made for the same purpose, that is, to place the Rutledges in the same position they would have been had they been able to identify and collect liability insurance proceeds from the phantom driver.

As such, we do not believe that the damages from the City and the UM benefits from AIG could be considered "discrete and independent," and thus a double recovery as was allowed in *Caberto* is not warranted here.

## V.

Accordingly, we vacate the court's October 27, 1995 order granting the Rutledges' summary judgment motion and the July 11, 1996 judgment. We remand the case to the court with instructions to (1) enter summary judgment in favor of AIG and order the Rutledges to each reimburse AIG for the UM benefits paid, and (2) determine AIG's request for attorneys' fees and costs.