Electronically Filed
Supreme Court
SCAP-15-0000460
26-MAY-2017
07:55 AM

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

_____

GREGORY SHIGEO YUKUMOTO and DIANE YUKUMOTO,
Plaintiffs-Appellees,

vs.

RUTH TAWARAHARA,
Defendant-Appellee.

_____

HAWAII MEDICAL SERVICE ASSOCIATION,
Intervenor-Plaintiff-Appellant,

vs.

RUTH TAWARAHARA,
Defendant-Appellee.

_____

SCAP-15-0000460

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CAAP-15-0000460; CIV. NO. 14-1-001245; CIV. NO. 15-1-000105)

MAY 26, 2017

RECKTENWALD, C.J., NAKAYAMA, McKENNA, POLLACK, AND WILSON, JJ.

OPINION OF THE COURT BY RECKTENWALD, C.J.

This case presents an issue of first impression: whether health insurers have subrogation rights against third-party tortfeasors who cause injury to their insureds. For the following reasons, we conclude that a health insurer does not have a broad, unrestricted right of subrogation, but rather is limited to reimbursement rights established by statute.

## I. Background

### A. The Accident

This case arises from an accident that occurred on March 20, 2014, when Gregory Yukumoto was driving his moped in Honolulu. Ruth Tawarahara, who was driving an SUV, attempted to make a left turn in front of Yukumoto, and struck him with her vehicle. Yukumoto sustained serious injuries, including brain injury, traumatic hemorrhagic shock, acute respiratory failure, left tibial fracture, right fibula fracture, L2 compression fracture, multiple wounds, and multiple hematomas.

### B. Circuit Court Proceedings

Gregory Yukumoto and his wife, Diane, filed a complaint against Ruth Tawarahara in the Circuit Court of the First Circuit. Hawaiʻi Medical Service Association (HMSA) subsequently filed its "Notice of Claim of Lien," contending that HMSA had paid $325,824.33 for medical expenses associated with Yukumoto's injuries as of September 20, 2014.

2

The Yukumotos filed a Petition for Determination of Validity of Claim of Lien by HMSA pursuant to Hawaiʻi Revised Statutes (HRS) § 663-10 (Petition).  According to the Petition, Yukumoto's wage loss and general damages claim was "approximately $4,000,000."  The Yukumotos contended that Ruth Tawarahara had only $1,100,000 of insurance coverage through a State Farm Insurance policy, which State Farm agreed to pay "pursuant to a general damages only release."  The Yukumotos and Tawarahara had agreed to their settlement on November 6, 2011.  Tawarahara did not admit fault for the accident.  Coupled with a $50,000 "underinsured motorist claim" that the Yukumotos submitted to GEICO Insurance, the Petition contended that the Yukumotos' "total recovery, before payment of attorneys' fees and costs, was $1,150,000" and that "[t]hey remain undercompensated by approximately $2,850,000."  Gregory Yukumoto's HMSA health insurance was provided through his employer, the State of Hawaiʻi.

The Yukumotos sought "a ruling that HMSA has no lien nor subrogation rights in their personal injury settlements because HMSA cannot satisfy the provisions of" HRS § 663-10.[1]

_____

[1]     HRS § 663-10 (Supp. 2002) provides:

        (a) In any civil action in tort, the court, before any judgment or stipulation to dismiss the action is approved, shall determine the validity of any claim of a lien against the amount of the judgment or settlement by any person who files timely notice of the claim to the court or to the parties in the

(continued...)

3

[1](...continued)
action.  The judgment entered, or the order subsequent to settlement, shall include a statement of the amounts, if any, due and owing to any person determined by the court to be a holder of a valid lien and to be paid to the lienholder out of the amount of the corresponding special damages recovered by the judgment or settlement.  In determining the payment due the lienholder, the court shall deduct from the payment a reasonable sum for the costs and fees incurred by the party who brought the civil action in tort.  As used in this section, lien means a lien arising out of a claim for payments made or indemnified from collateral sources, including health insurance or benefits, for costs and expenses arising out of the injury which is the subject of the civil action in tort.  If there is a settlement before suit is filed or there is no civil action pending, then any party may petition a court of competent jurisdiction for a determination of the validity and amount of any claim of a lien.

(b) Where an entity licensed under chapter 432 or 432D possesses a lien or potential lien under this section:

(1) The person whose settlement or judgment is subject to the lien or potential lien shall submit timely notice of a third-party claim, third-party recovery of damages, and related information to allow the lienholder or potential lienholder to determine the extent of reimbursement required.  A refusal to submit timely notice shall constitute a waiver by that person of section 431:13-103(a)(10).  An entity shall be entitled to reimbursement of any benefits erroneously paid due to untimely notice of a third-party claim;

(2) A reimbursement dispute shall be subject to binding arbitration in lieu of court proceedings if the party receiving recovery and the lienholder agree to submit the dispute to binding arbitration, and the process used shall be as agreed to by the parties in their binding arbitration agreement; and

(3) In any proceeding under this section to determine the validity and amount of reimbursement, the court or arbitrator

(continued...)

4

They alleged that under HRS § 663-10, "[f]or a health insurer to receive any portion of a plaintiff's recovery from the defendant, the health insurer has the burden of proving that the settlement or recovery duplicates medical expenses that were paid by the health insurer."

Lienor HMSA filed a memorandum in opposition, arguing that the Petition should be denied because HRS § 663-10 "does not abrogate HMSA's contractual lien or subrogation rights, but rather provides HMSA with an independent statutory right to assert its lien on any amount that [the Yukumotos] recover." (Emphasis in original.) HMSA also filed an Amended Notice of Claim of Lien for the amount of $337,351.79, and a motion to intervene in the action.

At a hearing on the Petition, the court requested that the parties submit supplemental briefing on the legislative

---

[1](...continued)

        shall allow a lienholder or person
        claiming a lien sufficient time and
        opportunity for discovery and
        investigation.

For purposes of this subsection:

"Timely notice of a third-party claim" means a reasonable time after any written claim or demand for damages, settlement recovery, or insurance proceeds is made by or on behalf of the person.

"Third-party claim" means any tort claim for monetary recovery or damages that the individual has against any person, entity, or insurer, other than the entity licensed under chapter 432 or 432D.

5

history and intent of HRS § 663-10.[2]  Following the submittal of the supplemental briefing, the court held another hearing.  At that hearing, HMSA contended that its "rights under 663-10 to be reimbursed by Plaintiffs . . . are greatly facilitated by intervention" because it would be able to make "formal discovery requests."  HMSA represented that the purpose of the discovery would be to assist the court in making its "determinations under [HRS §] 663-10" as to whether there was any duplication between the settlement funds paid by Tawarahara and the medical expenses paid by HMSA.  The Yukumotos contended "that Hawaii's Unfair Claims Practices Act makes it illegal and an unfair claims practice to limit the coverage to a Plaintiff who has a third-party claim."  They argued that HRS § 431:13-103(10) was "specifically applicable to mutual benefit societies and HMSA[,]" and HMSA was violating the statute by "'refusing to provide or limiting coverage available to an individual because the individual may have a third-party claim.'"  The Yukumotos further maintained that HRS § 663-10 was an "anti-subrogation statute" and HMSA's exclusive remedy, and that the legislative history of HRS § 663-10 supported their position.

The court orally granted HMSA's motion to intervene at the hearing and subsequently filed an order limiting discovery to "what is contemplated under HRS § 663-10."  The court also ruled

---

[2]  The Honorable Rhonda A. Nishimura presided.

that HRS § 663-10 abrogated HMSA's right of subrogation against Defendant Tawarahara, holding that the statute provided HMSA's exclusive remedy "in this particular type of situation," based on "the statute itself, the legislative history, and the absence of any particular case law[.]"

HMSA filed its complaint in intervention (Complaint) in January 2015. HMSA contended that it was a mutual benefit society as defined in HRS Chapter 432 and that it was a "'lienholder or person claiming a lien' pursuant to applicable laws, including but not limited to HRS § 663-10, and has rights of subrogation and other reimbursement rights arising from its contract with Plaintiff Gregory Yukumoto and at common law." HMSA asserted that it had "extended benefits on behalf of Plaintiff Gregory Yukumoto in the amount of $339,255.40 as of January 5, 2015." HMSA sought judgment against Defendant Tawarahara in the sum of $339,255.40 "with interest thereon at the rate of 10% per annum from date of judgment until paid," as well as payment of its fees and costs. HMSA also filed a separate complaint against Tawarahara, seeking to ensure its subrogation claim was preserved and to obtain payment of medical benefits it extended on behalf of Mr. Yukumoto.

Tawarahara filed a motion for partial dismissal of HMSA's Complaint, arguing that HMSA asserted subrogation claims which the court determined "do not exist as a matter of law." The Yukumotos filed a substantive joinder to Defendant

7

Tawarahara's motion for partial dismissal and a motion to dismiss Defendant Tawarahara with prejudice, pursuant to Hawaiʻi Rules of Civil Procedure (HRCP) Rule 41(a)(2) (2012).[3]  HMSA opposed the motion, largely reiterating previous arguments.

In their answer to HMSA's Complaint, the Yukumotos contended that the Complaint was barred by HRS § 431:13-103(a)(10)[4] and 663-10, and that because "[the Yukumotos']

_____

[3]    HRCP Rule 41(a)(2) ("Voluntary Dismissal:  Effect Thereof") provides:

> (2) <u>By Order of Court</u>.  Except as provided in paragraph (1) of this subdivision of this rule, an action shall not be dismissed at the plaintiff's instance save upon order of the court and upon such terms and conditions as the court deems proper.  If a counterclaim has been pleaded by a defendant prior to the service upon the defendant of the plaintiff's motion to dismiss, the action shall not be dismissed against the defendant's objection unless the counterclaim can remain pending for independent adjudication by the court.  Unless otherwise specified in the order, a dismissal under this paragraph is without prejudice.

(Emphasis in original.)

[4]    HRS § 431:13-103(a)(10) (Supp. 2002) provides:

> (a) The following are defined as unfair methods of competition and unfair or deceptive acts or practices in the business of insurance:
> . . . .
>
>> (10) Refusing to provide or limiting coverage available to an individual because the individual may have a third-party claim for recovery of damages; provided that:
>>
>>> (A) Where damages are recovered by judgment or settlement of a third-party claim, reimbursement of past benefits paid shall be allowed pursuant to section 663-10;
>>>
>>> (B) This paragraph shall not apply to entities licensed under chapter 386 or 431:10C; and

(continued...)

8

settlement with Defendant Ruth Tawarahara was for general damages only," HMSA "cannot meet its burden of proving a duplication of benefits and therefore has no reimbursement rights herein." In response, HMSA argued that it would be prejudiced by Tawarahara's dismissal because it would lose its "contract and common law" rights of subrogation against her.

---

[4](...continued)

> (C) For entities licensed under chapter 432 or 432D:
>
>> (i) It shall not be a violation of this section to refuse to provide or limit coverage available to an individual because the entity determines that the individual reasonably appears to have coverage available under chapter 386 or 431:10C; and
>> (ii) Payment of claims to an individual who may have a third-party claim for recovery of damages may be conditioned upon the individual first signing and submitting to the entity documents to secure the lien and reimbursement rights of the entity and providing information reasonably related to the entity's investigation of its liability for coverage.
>
> Any individual who knows or reasonably should know that the individual may have a third-party claim for recovery of damages and who fails to provide timely notice of the potential claim to the entity, shall be deemed to have waived the prohibition of this paragraph against refusal or limitation of coverage. "Third-party claim" for purposes of this paragraph means any tort claim for monetary recovery or damages that the individual has against any person, entity, or insurer, other than the entity licensed under chapter 432 or 432D[.]

At a hearing on the motions, the court noted that the legislature has set up a protocol that is "very detailed in terms of addressing HMSA's lien regarding its validity, regarding the dollar amount" and that, regarding duplication of funds, "they have set up a process whereby discovery is intended, and the court is allowing HMSA to conduct discovery as to whether or not there is duplication such that their lien rights under [HRS §] 663-10 [are] protected because if it's duplicative, then there is a reimbursement."

The court subsequently entered an order granting the Yukumotos' motion to dismiss Defendant Tawarahara, dismissing all claims against her with prejudice. The court also ordered the Yukumotos' counsel to retain $339,255.40 from the settlement funds received from Tawarahara in their client trust account, as that was the amount set forth in HMSA's Notice of Claim of Lien.

Tawarahara filed a motion to consolidate HMSA's separate lawsuit against her with the underlying Yukumotos' lawsuit, which HMSA opposed. The court granted Tawarahara's motion to consolidate.

Two days before the court granted the motion to consolidate, HMSA filed a supplemental memorandum in opposition to the Yukumotos' Petition. HMSA asserted that it did "not believe it [would] be able to meet its burden to establish by a preponderance of the evidence that the settlement proceeds paid

by Defendant Ruth Tawarahara to Plaintiffs duplicate the medical benefits paid by HMSA."

Defendant Tawarahara filed a motion to dismiss the case. Tawarahara argued that HMSA had no standing to bring an action against her because the court had ruled that HMSA's subrogation rights were abrogated. In opposition, HMSA argued that "its right of subrogation against Tawarahara is separate and independent from its right of reimbursement from Mr. Yukumoto under HRS § 663-10, and will survive the Court's ruling as to a distribution of the proceeds of the pending settlement under HRS § 663-10," and that "a ruling by the Court that the settlement does not duplicate the medical benefits paid by HMSA will conclusively establish that Tawarahara is still liable to HMSA for that element of damages resulting from her tortious conduct."

The court held a hearing on both the Yukumotos' Petition and Tawarahara's motion to dismiss, and orally granted the motion to dismiss and agreed to release the Yukumotos' settlement funds to the Yukumotos' counsel. The court entered its order granting the Yukumotos' Petition, ruling that "HMSA is not entitled to a payment of the amount of its claimed lien," and permitting Plaintiffs' counsel to release the settlement proceeds that were being held in their client trust account to the Yukumotos. The court entered final judgment on May 28, 2015. HMSA timely filed its Notice of Appeal.

11

**C.   HMSA's Appeal and Application for Transfer**

In its opening brief, HMSA argued that the "circuit court erred in ruling that HRS § 663-10 and/or HRS § 431:13-103(a)(10) abrogates Appellant HMSA's contractual and common law rights in subrogation against a third-party tortfeasor responsible for injury to its insured."

The Yukumotos and Tawarahara (Appellees) filed a joint answering brief, which detailed the legislative history of the two statutes, stating that the Hawai'i legislature "made clear that health insurers have no subrogation rights in personal injury settlements, and specifically defined a health insurer's 'right of reimbursement' as codified under HRS § 663-10" and "determined that a health insurer should be reimbursed from a personal injury settlement to the extent that the settlement duplicated benefits paid by the health insurer."

In its reply brief, HMSA argued that there was no evidence of legislative intent to abrogate its subrogation rights and that "[n]one of [Appellees'] arguments provide citations to the legislative history, because they find no support there." (Emphasis in original.)  HMSA also argued that State Farm Fire and Cas. Co. v. Pacific Rent-All, Inc., 90 Hawai'i 330, 978 P.2d 768 (1999) is directly applicable to this case, and should have been applied by the circuit court.

HMSA filed an application for transfer to this court, which we granted.

12

## II.  Standards of Review

### A.  Statutory Interpretation

"Statutory interpretation is a question of law reviewable de novo."  State v. Wheeler, 121 Hawai'i 383, 390, 219 P.3d 1170, 1177 (2009) (internal quotation marks omitted).  This court's construction of statutes is guided by the following rules:

> First, the fundamental starting point for statutory interpretation is the language of the statute itself. Second, where the statutory language is plain and unambiguous, our sole duty is to give effect to its plain and obvious meaning.  Third, implicit in the task of statutory construction is our foremost obligation to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself.  Fourth, when there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists.

Id. (quoting Citizens Against Reckless Dev. v. Zoning Bd. of Appeals of the City & Cty. of Honolulu, 114 Hawai'i 184, 193, 159 P.3d 143, 152 (2007)).

"[W]e may only resort to the use of legislative history when interpreting an ambiguous statute."  State v. Valdivia, 95 Hawai'i 465, 472, 24 P.3d 661, 668 (2001).

### B.  Motions to Dismiss

"A trial court's ruling on a motion to dismiss is reviewed de novo."  Kamaka v. Goodsill Anderson Quinn & Stifel, 117 Hawai'i 92, 104, 176 P.3d 91, 103 (2008) (citation omitted).

### III. Discussion

The issue presented here is whether health insurers retain their subrogation rights against third-party tortfeasors who cause injury to their insureds.

HMSA argues that under State Farm, its "equitable common law right of subrogation" is protected in the context of health insurance. According to HMSA, this common law right allows for insurer's rights in subrogation to be "independent . . . and take priority over the insured's interest in settling with a third party." HMSA additionally argues that the legislative history of HRS §§ 663-10 and 431:13-103(a)(10) does not support a finding that the laws abrogate its claimed subrogation rights. Further, HMSA argues that it has contractual subrogation rights, noting that Mr. Yukumoto's agreement with HMSA expressly provided a right of subrogation.

In response, Appellees argue that the legislative history of HRS §§ 663-10 and 431:13-103 makes clear that health insurers have "no subrogation rights in personal injury settlements," and that a health insurer "should be reimbursed from a personal injury settlement to the extent that the settlement duplicated benefits paid by the health insurer." With respect to HMSA's contractual subrogation rights, Appellees argue that the contract provision is void as against public policy in light of HRS §431:13-103, and thus unenforceable.

We conclude that State Farm does not apply to

14

situations involving an insurer's right to subrogation in the context of personal insurance such as the instant case, and thus, here, HMSA does not have equitable subrogation rights.  We also conclude that the legislature intended to limit a health insurer's right of subrogation under HRS §§ 663-10 and 431:13-103.  Thus, we conclude that any contractual provision that conflicts with HRS § 663-10 is invalid, and that HMSA is not entitled to contractual subrogation rights.  Therefore, the circuit court properly granted the Yukumotos' Petition and Tawarahara's motion to dismiss, and we affirm the circuit court's judgment.

## A. HMSA Does Not Have Equitable Subrogation Rights Against a Third-Party Tortfeasor

Subrogation is a "creature of equity," and is premised on the notion that an insured should not be able to "unduly benefit from a loss and thereby enjoy a 'double recovery' from both the insurer and the tortfeasor."  St. Paul Fire & Marine Ins. Co. v. Liberty Mut. Ins. Co., 135 Hawaiʻi 449, 452, 353 P.3d 991, 994 (2015); Roger Baron, Subrogation: A Pandora's Box Awaiting Closure, 41 S.D. L. Rev. 237, 241 (1996); see also Johnny C. Parker, The Made Whole Doctrine:  Unraveling the Enigma Wrapped in the Mystery of Insurance Subrogation, 70 Mo. L. Rev. 723 (2005).  Subrogation exists to provide insurers with a mechanism "to recover the costs of reimbursing injured insured

15

parties."  Parker, supra, at 723; see St. Paul, 135 Hawaiʻi at
452, 353 P.3d at 994.

Because subrogation is designed to achieve an equitable
adjustment of rights between the insured and insurer, "its
contours cannot always be contractually defined," meaning that
whether or not the right to subrogation arises depends on the
type of insurance involved.  Parker, supra, at 728.  Subrogation
rights in the "personal insurance" context are treated
differently from subrogation rights in the property or casualty
insurance context.[5]  See Perreira v. Rediger, 778 A.2d 429, 437
(N.J. 2001) (stating that "policies covering property damage such
as fire insurance have regularly been held to include an implied
right of subrogation," but in the area of "personal insurance,"
which includes health and medical insurance, the "same has not
been true").  Subrogation in these contexts is treated
differently because the two types of insurance cover different
losses.  See id. at 437-38 (citations omitted); see also Parker,
supra, at 730-32.  Courts have applied the principle of equitable
subrogation to property and casualty insurance policies because

_____

[5]     Personal insurance is distinguishable from indemnity insurance
such as property/casualty and liability because personal insurance is
"insurance upon the person of an individual or group of individuals."  Parker,
supra, at 730.  Insurance other than personal insurance "in some way involves
a res different from the person of the policy holder.  In personal insurance,
however, that is the sole object of concern, and liability of the insurer
arises, ordinarily, upon the insured's death or, perhaps, disability resulting
from accident or illness."  Parker, supra, at 730.  "Policies providing
benefits for medical or hospital expenses are generally viewed by courts as
contracts for personal insurance."  Parker, supra, at 731 (citing Cunningham
v. Metro. Life Ins. Co., 360 N.W.2d 33, 37-39 (Wis. 1985)).

"the insured's actual loss is generally liquidated in the context of property insurance," and "any excess compensation from the combination of insurance proceeds and tort recovery can be determined with certainty."[6]  Parker, supra, at 729.  Thus, the right to equitable subrogation prevents the insured from obtaining a double recovery by ensuring that the insured will pay the insurer for any duplication of damages received as a result of settlement.  See id.

In contrast, many jurisdictions have treated rights to equitable subrogation differently in the context of "personal insurance."  Id. at 731-32.  For the courts that have addressed the "question of the existence of a common-law equitable right of subrogation," the "weight of authority" has concluded that "no such right exists in the health insurance field."  Perreira, 778 A.2d at 437 (citing cases); see Parker, supra, at 731-32 (citing cases) ("The overwhelming majority of jurisdictions that have addressed the issue of whether equitable subrogation applies to personal insurance contracts have concluded that such an insurer has no right to subrogation absent an expressed provision in the policy.").  The New Jersey Supreme Court stated the rationale

---

[6]     Two types of subrogation exists:  (1) "equitable subrogation," which is a principle of equity that is "effected by operation of law and arises out of a relationship that need not be contractually based;" and (2) "conventional" or "contractual subrogation," which "arises out of the contractual relationship of the parties."  State Farm, 90 Hawaiʻi at 328, 978 P.2d at 766.

17

behind the rule against finding equitable subrogation in personal insurance:

> Subrogation rights are common under policies of property or casualty insurance, wherein the insured sustains a fixed financial loss, and the purpose is to place that loss ultimately on the wrongdoer. To permit the insured in such instances to recover from both the insurer and the wrongdoer would permit him to profit unduly thereby.
>
> In personal insurance contracts, however, the exact loss is never capable of ascertainment. Life and death, health, physical well being, and such matters are incapable of exact financial estimation. There are, accordingly, not the same reasons militating against a double recovery. The general rule is, therefore, that the insurer is not subrogated to the insured's rights or to the beneficiary's rights under contracts of personal insurance, at least in the absence of a policy provision so providing. Nor would a settlement by the insured with the wrongdoer bar his cause of action against the insurer. However, if a subrogation provision were expressly contained in such contracts, it probably would be enforced quite uniformly. Such a provision cannot be read into a policy by calling it an indemnity contract, however.

Perreira, 778 A.2d at 438 (quoting 3 J.A. Appleman & J. Appleman, Insurance Law & Practice, § 1675 at 495); see also Am. Pioneer Life Ins. Co. v. Rogers, 753 S.W.2d 530, 532-33 (Ark. 1988) ("The principles which cause us to recognize equitable subrogation in property disputes are not present in the field of medical expense payments for personal injuries.").

In line with other jurisdictions' rationale to support the general rule that there is no right to equitable subrogation in the health and medical insurance context, Hawaiʻi courts have also recognized the differences between subrogation rights for

18

property/casualty insurance and subrogation rights for personal insurance.  In State Farm, this court's ruling follows the majority rule for subrogation in the context of property insurance.  See 90 Hawaiʻi at 330, 978 P.2d at 768.  In State Farm, the insured rented a gas compressor from Pacific Rent-All (Pacific).  Id. at 319, 978 P.2d at 757.  The gas compressor malfunctioned, which resulted in fire damage to the insured's building and vehicle.  Id.  Following the accident, State Farm paid for the damages that the insured incurred.  Id.  Subsequently, the insured reached a settlement agreement with Pacific, which released all claims "arising out of personal injury and property damage" that resulted from the incident.  Id. at 319-20, 978 P.2d at 757-58.  After the settlement, State Farm filed a claim to assert its subrogation rights against Pacific for damages that the insured suffered.  Id. at 320, 978 P.2d at 758.  Pacific moved to dismiss State Farm's claim based on the defenses of "release and accord and satisfaction."  Id. at 319-20, 978 P.2d at 757-58.  This court held that "in the context of fire and casualty insurance . . . the insurer may maintain a subrogation action against the tortfeasor" regardless of outside settlement.  Id. at 330, 978 P.2d at 768.

In contrast, in the personal insurance context, Hawaiʻi courts have specifically limited an insurer's right to subrogation.  In AIG Hawaiʻi Ins. Co., Inc. v. Rutledge, the Intermediate Court of Appeals (ICA) addressed a similar issue to

19

that in this case in the context of uninsured motorist (UM) benefits.[7]  See 87 Hawai'i 337, 341, 955 P.2d 1069, 1073 (App. 1998).  In Rutledge, the insured settled its claims against the City and County of Honolulu, but not against the uninsured tortfeasor.  Id. at 340, 955 P.2d at 1072.  Following settlement, AIG sought recovery from its insured for the UM benefits that the insured had received following the accident.  Id.  The ICA ruled that an insurance carrier providing UM coverage is "entitled to reimbursement for payments it makes to an accident victim to the extent the victim's total recovery from all sources exceeds his or her damages [but] the carrier is entitled to no reduction of UM coverage . . . where the victim is not fully compensated."  Id. at 346, 955 P.2d at 1078 (quoting Bradley v. H.A. Manosh Corp., 601 A.2d 978, 983-84 (1991)).  Therefore, the ICA concluded that "in the allocation of tort recovery proceeds and UM benefits, we agree with the principle of full but not duplicative recovery of damages by the injured insured."  Id.

Similarly in Sol v. AIG Hawai'i Ins. Co., this court enforced a statutory limit under HRS § 431:10C-307 (Supp. 1992) on subrogation for no-fault insurers against UM benefits.[8]  See

---

[7]     Uninsured-motorist coverage allows an insured to recover damages for "injuries and losses negligently caused by a driver who has no liability insurance."  Uninsured-Motorist Coverage, Black's Law Dictionary (10th ed. 2014).

[8]     HRS § 431:10C-307 provides:

Whenever any person effects a tort liability recovery
(continued...)

20

76 Hawaiʻi 304, 307-08, 875 P.2d 921, 924-25 (1994).  In its ruling, this court followed the legislature's "intent to disallow the subrogation rights of the no-fault carrier against 'optional additional' coverages when it amended the statute in 1977":

> This section [Section 294-7, "Rights of Subrogation"] is amended to clearly state the original intent of the Legislature when it passed the Hawaiʻi No-fault Law. Whenever any person effects a tort liability recovery for accidental harm, whether by suit or by settlement, the no-fault insurer is entitled to subrogate fifty percent of the no-fault benefits, up to the maximum limit specified by Section 294-3(c).  That limit is in the amount of $15,000.  Therefore, if the no-fault insurer paid no-fault benefits in excess of this $15,000 amount; the proper application of the present law as specified in Sections 294-2(10), 294-3, 294-4, and 294-10, Hawaiʻi Revised Statutes, leaves no room for interpretation; but that the maximum amount that the no-fault insurer may subrogate is in the amount of fifty per cent of $15,000.  The no-fault insurer cannot subrogate against the optional additional coverages, which by rules and regulations of the Commissioner of Motor Vehicle Insurance each insurer is required to offer each applicant.

Id. at 307–08, 875 P.2d at 924–25 (citing S. Conf. Comm. Rep. No. 776, in 1977 Senate Journal at 1184) (other citations and emphasis omitted).

This court stated that pursuant to HRS § 431:10C-301(b)(3), insurance coverage for uninsured motorists is "optional coverage" because HRS § 431:10C-301(b)(3) provides that

---

[8](...continued)
for accidental harm, whether by suit or settlement, which duplicates no-fault benefits already paid under the provisions of this article, the no-fault insurer shall be reimbursed fifty per cent of the no-fault benefits by such person receiving the duplicate benefits, up to the maximum limit specified by section 431:10C-103(6).

uninsured motorist coverage "may be rejected."[9]  Id. at 308, 875
P.2d at 925.  This court then concluded that it followed that
because the legislature "intended to prevent no-fault insurers
from subrogating against the optional additional coverages,
uninsured motorist coverage is exempt from no-fault
reimbursement."  Id.

Thus, our courts have recognized the difference between
property/casualty insurance and personal insurance by allowing
the insured to maintain subrogation rights in a property
insurance context in State Farm, and limiting subrogation rights
in personal insurance contexts in Rutledge and Sol.  Situations
involving tort recovery in personal insurance contexts, like the
instant case, often include payment by the tortfeasor for
intangible losses such as life, death, health, pain and
suffering, and physical well being, where it is difficult to
ascertain exact measurements of loss.  In this way, recovery for

_____

[9]     HRS § 431:10C-301(b)(3) (1993) provides:

(b) A motor vehicle insurance policy shall include:
. . .

(3) With respect to any motor vehicle registered or
principally garaged in this State, liability coverage
provided therein or supplemental thereto, in limits
for bodily injury or death set forth in Paragraph (1),
under provisions filed with and approved by the
commissioner, for the protection of persons insured
thereunder who are legally entitled to recover damages
from owners or operators of uninsured motor vehicles
because of bodily injury, sickness, or disease,
including death, resulting therefrom; provided,
however, that the coverage required under this section
shall not be applicable where any insured named in the
policy shall reject the coverage in writing.

22

medical insurance benefits and tort damages do not involve the principles which support our recognition of equitable subrogation in the property/casualty context, and recovery does not necessarily produce a windfall or duplicative recovery to the insured.  We are therefore persuaded to join the majority rule, and hold that an insurer does not have equitable subrogation rights in personal insurance contexts.

**B.    The Hawaiʻi State Legislature Has Limited a Health Insurer's Right to Subrogation Under HRS §§ 663-10 and 431:13-103**

It is clear from the plain language of HRS § 663-10 (Supp. 2002) that the legislature has limited the subrogation rights of health insurers.  As reflected in its title, "Collateral sources; protection for liens and <u>rights of subrogation</u>" (emphasis added), the statute provides a comprehensive structure for addressing liens and subrogation rights in this context.  HRS § 663-10(a) (Supp. 2002) provides in relevant part:

> In any civil action in tort, the court, before any judgment or stipulation to dismiss the action is approved, <u>shall determine the validity of any claim of a lien against the amount of the judgment</u> or settlement by any person who files timely notice of the claim to the court or to the parties in the action.  The judgment entered, or the order subsequent to settlement, shall include a statement of the amounts, if any, due and owing to any person determined by the court to be a holder of a valid lien and to be paid to the lienholder out of the amount of the corresponding <u>special damages</u> recovered by the judgment or settlement.  In determining the payment due the lienholder, the court shall deduct from the payment a reasonable sum for the costs and fees

23

incurred by the party who brought the civil action in tort. As used in this section, <u>lien means a lien arising out of a claim for payments made or indemnified from collateral sources, including health insurance or benefits</u>, for costs and expenses arising out of the injury which is the subject of the civil action in tort. If there is a settlement before suit is filed or there is no civil action pending, then any party may petition a court of competent jurisdiction for a determination of the validity and amount of any claim of a lien.[10]

---

[10] HRS § 663-10 (Supp. 2002) continues on and provides:

(b) Where an entity licensed under chapter 432 or 432D possesses a lien or potential lien under this section:

(1) The person whose settlement or judgment is subject to the lien or potential lien shall submit timely notice of a third-party claim, third-party recovery of damages, and related information to allow the lienholder or potential lienholder to determine the extent of reimbursement required. A refusal to submit timely notice shall constitute a waiver by that person of section 431:13-103(a)(10). An entity shall be entitled to reimbursement of any benefits erroneously paid due to untimely notice of a third-party claim;

(2) A reimbursement dispute shall be subject to binding arbitration in lieu of court proceedings if the party receiving recovery and the lienholder agree to submit the dispute to binding arbitration, and the process used shall be as agreed to by the parties in their binding arbitration agreement; and

(3) In any proceeding under this section to determine the validity and amount of reimbursement, the court or arbitrator shall allow a lienholder or person claiming a lien sufficient time and opportunity for discovery and investigation.
For purposes of this subsection:

"Third-party claim" means any tort claim for monetary recovery or damages that the individual has against any person, entity, or insurer, other than the entity licensed under chapter 432 or 432D.

"Timely notice of a third-party claim" means a reasonable time after any written claim or demand for damages, settlement recovery, or insurance proceeds is

(continued...)

(Emphasis added.)

Thus, HRS § 663-10's comprehensive scope is also reflected in the statute's declaration that it applies broadly to "any claim of a lien." See id. HRS § 663-10 also specifically provides that the liens referred to in the statute include liens arising out of payments made from collateral sources, including "health insurance or benefits." Id. Thus, HRS § 663-10 applies to health insurers. Further, HRS § 663-10 specifically states that any judgment entered shall include the amount due and owing to any holder of a valid lien, to be paid to the lienholder from "special damages recovered by the judgment or settlement." Id. (emphasis added). Thus, the legislature limited the type of damages from which a lienholder may be reimbursed. The legislature did not provide that the lienholder may be reimbursed from an insured's recovery of general damages which, as mentioned previously, are difficult to determine exactly. Therefore, the plain language of HRS § 663-10 supports the conclusion that HMSA's subrogation rights are limited.

---

[10](...continued)
          made by or on behalf of the person.

(Emphasis added.)

     As reflected in the broad definition of "third-party claim," the statute demonstrates a legislative purpose to establish a comprehensive scheme for adjudicating reimbursement claims by health insurers, including a requirement that the third-party claimant notify the insurer of the claim.

Consistent with this interpretation, the legislative history of HRS §§ 663-10 and 431-13:103(a)(10) demonstrates that a health insurer's sole rights to reimbursement and subrogation are provided for in those statutes, and that a health insurer's right to subrogation is therefore limited. In 1986, the Hawai'i legislature enacted comprehensive tort reform legislation. The legislation, which was later codified as HRS § 663-10 (1993),[11] addressed the issue of reimbursement for collateral sources who made payments for "costs and expenses arising out of the injury." 1986 Special Sess. Haw. Sess. Laws Act 2, § 16 at 10. The legislation allowed for collateral sources to be reimbursed when

---

[11] HRS § 663-10 (1993) (Collateral sources; protection for liens and rights of subrogation) provides:

> In any civil action in tort, the court, before any judgment or stipulation to dismiss the action is approved, shall determine the validity of any claim of a lien against the amount of the judgment or settlement by any person who files timely notice of the claim to the court or to the parties in the action. The judgment entered, or the order subsequent to settlement, shall include a statement of the amounts, if any, due and owing to any person determined by the court to be a holder of a valid lien and to be paid to the lienholder out of the amount of the corresponding special damages recovered by the judgment or settlement. In determining the payment due the lienholder, the court shall deduct from the payment a reasonable sum for the costs and fees incurred by the party who brought the civil action in tort. As used in this section, lien means a lien arising out of a claim for payments made or indemnified from collateral sources for costs and expenses arising out of the injury which is the subject of the civil action in tort.

1986 Special Session Haw. Sess. Laws Act 2, § 16 at 10.

26

special damages recovered in a judgment or settlement duplicated the amounts they had paid.  Id.

In 2000, the legislature passed S.B. No. 2563, which became Act 29, the purpose of which was to "make it an unfair or deceptive act to limit or withhold coverage under insurance policies because a consumer may have a third-party claim for damages."  H. Stand. Comm. Rep. No. 1330-00, in 2000 House Journal, at 1515; see HRS § 663-10 (Supp. 2000).[12]  Act 29 made clear that collateral sources were required to pay benefits, and were limited to reimbursement under the statute in third-party

---

[12]     HRS § 663-10 (Supp. 2000) (Collateral sources; protection for liens and rights of subrogation) provides:

> In any civil action in tort, the court, before any judgment or stipulation to dismiss the action is approved, shall determine the validity of any claim of a lien against the amount of the judgment or settlement by any person who files timely notice of the claim to the court or the parties in the action. The judgment entered, or the order subsequent to settlement, shall include a statement of the amounts, if any, due and owing to any person determined by the court to be a holder of a valid lien and to be paid to the lienholder out of the amount of the corresponding special damages recovered by the judgment or settlement.  In determining the payment due the lienholder, the court shall deduct from the payment a reasonable sum for the costs and fees incurred by the party who brought the civil action in tort.  As used in this section, lien means a lien arising out of a claim for payments made or indemnified from collateral sources, including health insurance or benefits, for costs and expenses arising out of the injury which is the subject of the civil action in tort.  If there is a settlement before suit is filed or if there is no civil action pending, then any party may petition a court of competent jurisdiction for a determination of the validity and amount of any claim of a lien.

2000 Haw. Sess. Laws Act 29, § 2 at 57 (new language added underlined).

27

personal injury situations.  See H. Stand. Comm. Rep. No. 1330-00, in 2000 House Journal, at 1515.  Act 29 modified HRS § 663-10 by expressly including "health insurance or benefits" within its provisions.  2000 Haw. Sess. Laws Act 29, § 2 at 57.  The legislature enacted Act 29 with the intent to "prevent duplicate recoveries in personal injury claims while creating a fair, uniform and comprehensive procedure governing the rights and obligations of insurance companies and consumers for the reimbursement of insurance benefits from third-party sources of recovery."  H. Stand. Comm. Rep. No. 1330-00, in 2000 House Journal, at 1515.  The legislature also limited reimbursement and subrogation for all insurance companies, excluding health insurers, in HRS § 431:13-103(a)(10) (Supp. 2000), while also applying the same restrictions to reimbursement and subrogation to health insurers in HRS § 663-10.[13]  2000 Haw. Sess. Laws Act

---

[13]     Act 29 added HRS § 431:13-103(a)(10), which provided that an insurer would have committed an unfair insurance practice by:

> Refusing to provide or limiting coverage available to an individual because the individual may have a third party claim for recovery of damages; provided that:
>
>      (A) Where damages are recovered by judgment or settlement of a third-party claim, reimbursement of past benefits paid shall be allowed pursuant to section 663-10; and
>
>      (B) The paragraph shall not apply to entities licensed under chapter 386, 431:10C, 432, or 432D. . . .

2000 Haw. Sess. Laws Act 29 § 1, at 55 (emphasis omitted).

29, § 1 at 55; 2000 Haw. Sess. Laws Act 29, § 2 at 57.  The House

Committee on Consumer Protection and Commerce noted that:

> Health coverage and benefits are exempted from Section
> 431:13-103 and the same rights and obligations are
> placed in Section 663-10 for health insurers.  The
> amendment extends health benefit providers' third-
> party liability rights to settlements, as well as
> lawsuits under Section 663-10.  <u>This amendment places
> all of the rights and obligations of health benefit
> providers and consumers in Section 663-10 for third-
> party liability situations to create a uniform and
> comprehensive procedure</u>.

H. Stand. Comm. Rep. No. 1330-00, in 2000 House Journal, at 1515

(emphasis added).

In the next legislative session in 2001, the

legislature considered and subsequently passed S.B. 940, which

amended to HRS 431:13-103(a)(10) to expressly make it an unfair

insurance practice for a health insurer to limit or exclude

insurance coverage to an insured who has a third-party claim for

damages.  <u>See</u> S. Stand. Comm. Rep. No. 107, in 2001 Senate

Journal, at 987.  According to the Senate Committee on Commerce,

Consumer Protection and Housing, the purpose of S.B. 940 was to

"make mutual benefit societies (societies) and health maintenance

organizations (HMOs) subject to the unfair methods of competition

and unfair and deceptive acts and practices of the business of

insurance, for refusing to provide or limiting coverage to an

individual having a third-party claim for damages."  S. Stand.

Comm. Rep. No. 107, in 2001 Senate Journal, at 987.  The

Committee cited testimony of the State Insurance Commissioner,
which indicated that this measure:

> corrects an oversight in Act 29, Session Laws of
> Hawai'i (SLH) 2000, which should not have exempted
> societies and HMOs from insurance unfair practices for
> refusing to provide or limiting coverage to the
> insured who has a third-party claim.  Act 29, SLH
> 2000, established lien rights for health insurance
> benefits paid, which is a complement to revisions in
> the same measure to the insurance code relating to
> unfair insurance practices.

Id.

The Committee further explained its intent in enacting
S.B. 940:

> The intent of your Committee is that societies and
> HMOs promptly pay the benefits owing under their
> policies, and recoup their payments from a third-party
> claim by lien as provided under section 663-10, HRS.
> Testimony indicated that under current law, societies
> and HMOs may be interfering with a third-party
> settlement by claiming that they are exempt from
> insurance unfair trade practice as a result of Act 29,
> SLH 2000.  This was clearly not the intent of the
> legislature.  This measure clears up that confusion.

Id.

When deciding whether to enact S.B. 940, the House
Committee on Consumer Protection and Commerce received testimony
from HMSA that passage of the amendments would "eliminate the
ability of health plans to recover monies already paid on behalf
of members when these individuals receive a third party
settlement," resulting in a "double payment" for the client and
shifting costs from auto insurance to private health insurance,

which would "increase premiums borne by Hawaii's employers." However, the President of the Hawaiʻi Claims Managers Association, as well as private citizens, testified in support of S.B. 940, stating that HMSA "unfairly claims a disproportionate amount of settlements," and in many cases, "claims to be entitled to all of the settlement," effectively depriving insureds of large amounts of the settlement proceeds. The President of the Hawaiʻi Claims Managers Association also testified that HMSA's practices made it "very difficult to settle cases quickly and inexpensively" and has "unnecessarily delay[ed] payment of benefits to injured consumers."

S.B. 940 was carried over into the 2002 legislative session, and was adopted despite the concerns expressed by HMSA in its testimony. The Conference Committee, when considering proposed amendments to Act 29, stated that:

> Refusing to provide or limiting health coverage to persons who have third-party claims for damages is not permitted, except for reimbursement under section 663-10, Hawaiʻi Revised Statutes (HRS). This measure makes such acts unfair insurance practices under article 13 of the insurance code to eliminate any doubt that health insurers have always been subject to these limitations under section 663-10, HRS. Health insurers continue to be entitled to reimbursement of their subrogation liens under section 663-10, HRS.

Conf. Comm. Rep. No. 67-02, in 2002 House Journal, at 1783.

Thus, HRS § 663-10's legislative history supports the conclusion that HMSA's sole rights to reimbursement and subrogation are provided for in HRS §§ 663-10 and 431-

13:103(a)(1). First, the drafters indicated that "all of the rights and obligations of health benefit providers and consumers" are provided for in HRS § 663-10 for third-party liability situations, thus creating a "uniform and comprehensive procedure" for health insurers' subrogation and reimbursement rights. H. Stand. Comm. Rep. No. 1330-00, in 2000 House Journal, at 1515. The drafters also stated that "health insurers have always been subject to [the] limitations" under HRS § 663-10, and "continue to be entitled to reimbursement of their subrogation liens" under HRS § 663-10. Conf. Comm. Rep. No. 67-02, in 2002 House Journal, at 1783. Therefore, the legislature intended for HRS § 663-10 to serve as the authority which controls all of a health insurer's obligations and rights regarding reimbursement and subrogation benefits from third-party sources of recovery, which negates any argument that HRS § 663-10 applies only to reimbursement of an insurer by an insured. See H. Stand. Comm. No. 1330-00, in 2000 House Journal, at 1515. In conclusion, HRS §§ 663-10 and 431-13:103(a)(10) comprehensively addresses and limits a health insurers' rights to reimbursement and subrogation.

**C. Any Contractual Provision That Conflicts With HRS § 663-10 Is Invalid, and HMSA Is Not Entitled to Contractual Subrogation Rights**

HMSA argues that it has contractual subrogation rights because Mr. Yukumoto's agreement with HMSA expressly provides for a right of subrogation. However, "[w]hen the terms of an

insurance contract are in conflict with statutory language, the statute must take precedence over the terms of the contract." Sol, 76 Hawaiʻi at 307, 875 P.2d at 924 (citation omitted) (determining it unnecessary to address the clarity of the contract provisions in an insurance contract because the "terms of the contract contravened the statutory language intended to prevent off-sets of no-fault benefits from uninsured motorist benefits").  Here, it is clear that HRS § 663-10 limits HMSA's rights to subrogation against the tortfeasor, and thus, the statute is in conflict with the contractual provision. Therefore, because the statute must take precedence, the contractual provision is invalid, and HMSA is not entitled to contractual subrogation rights.[14]

---

[14]  We acknowledge a recent United States Supreme Court decision involving a health insurer's subrogation rights, but determine that it is distinguishable from the instant case.  See Coventry Health Care of Missouri, Inc., fka Group Health Plan, Inc. v. Nevils, No. 16-149 (U.S. Apr. 18, 2017). Coventry involved the Federal Employees Health Benefits Act of 1959 (FEHBA), which "establishes a comprehensive program of health insurance for federal employees."  Coventry, No. 16-149, slip op. at 2.  The FEHBA authorizes the Office of Personnel (OPM) to "contract with private carriers for federal employees' health insurance," and includes a provision that expressly preempts state law that "relates to health insurance or plans."  Id. at 1 (citation omitted).  The contracts that OPM negotiates with private carriers provide for reimbursement and subrogation.  Id.  However, several states, including the state at issue in that case, "bar enforcement of contractual subrogation and reimbursement provisions."  Id. at 1-2.

In Coventry, a former federal employee, Jodie Nevils, was insured under a FEHBA plan and was injured in an automobile accident.  Id. at 3.  Coventry paid Nevils' medical expenses, and Nevils subsequently sued the driver who caused his injuries and obtained a settlement award.  Id.  Coventry asserted a lien against part of the settlement to cover medical bills.  Id. at 3-4. Nevils repaid the lien amount, and then filed a class action in Missouri state court, arguing that Coventry had unlawfully acquired reimbursement.  Id.  The trial court granted summary judgment in Coventry's favor, and the Missouri Court of Appeals affirmed, but the Missouri Supreme Court reversed.  Id. at 4. The United States Supreme Court granted certiorari to resolve conflicting
(continued...)

## IV. Conclusion

For the foregoing reasons, we hold that: (1) a health insurer does not have equitable subrogation rights against a third-party tortfeasor in the context of personal insurance; (2) a health insurer's subrogation and reimbursement rights are limited by HRS §§ 663-10 and 431-13:103(a)(10); and (3) any contractual provision that conflicts with HRS § 663-10 is invalid. We further hold that HRS § 663-10 takes precedence over HMSA's contractual subrogation rights. Therefore, the circuit court properly granted the Yukumotos' Petition and Tawarahara's motion to dismiss, and we affirm the circuit court's May 28, 2015 judgment.

| | |
|---|---|
| Dianne Winter Brookins<br>for appellant | /s/ Mark E. Recktenwald |
| | /s/ Paula A. Nakayama |
| Woodruff K. Soldner<br>for appellees Gregory Yukumoto<br>and Diane Yukumoto (Charles J.<br>Ferrera for appellee Ruth<br>Tawarahara, with him on the<br>brief) | /s/ Sabrina S. McKenna |
| | /s/ Richard W. Pollack |
| | /s/ Michael D. Wilson |



---

[14](...continued)
interpretations of the FEHBA provision. Id. at 5. Upon review, the Court held that FEHBA's provision preempted state law which prohibited subrogation and reimbursement by a health insurer. Id. at 2, 5-8.

The instant case is distinguishable from Coventry because Yukumoto is a State employee, not a federal employee, and thus this case does not involve the FEHBA and its provision preempting state law relating to health insurance. Therefore, Coventry does not affect our decision here, and HMSA does not have contractual subrogation rights.